CASE 33—PETITION ORDINARY—JUNE 22.

# Standeford vs. Wingate.
# Young vs. Gibbons.
# Gibbons vs. Young.

APPEALS FROM FAYETTE CIRCUIT COURT.

1. The charter of Lexington provides for the election of mayor, and other officers, on the first Saturday in January in each year, for the term of one year, to commence immediately after the election, the elected officers to be installed the first Thursday thereafter. A statute of 1864 extended the term to two years. On the first Saturday in January, 1865, the mayor and other officers were elected, and were installed the first succeeding Thursday. In February, 1866, an act was passed restoring the term to one year, and providing for the election on the first Saturday in March in each year. Under the latter act a mayor and other officers were elected, and, on the first Thursday thereafter, they were sworn in. *Held*— That the act of 1866, and the election under it, were constitutional and valid, and entitled the persons elected to hold their respective offices for a year succeeding their election.

2. Although the act of 1866 does not expressly, yet it does constructively, provide that it shall be in force before the 3d March, 1866, and, therefore, its operation is not postponed, under the general statute, until after sixty days from its passage.

3. Any office established by statute may be abolished by statute, unless it be a contract which cannot be impaired by legislation. An office established and held for the public good is not a contract, nor is its tenure secured by any binding contract.

HUNT & BECK, for Standeford and Young, cited 3 *Gray*, 126.

M. C. JOHNSON, for Wingate and Gibbons, cited *Constitution of Kentucky, sec. 6 of art. 6; 2 Tucker's Bl. Com.*, 36, *and notes.*

Z. GIBBONS on same side.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

This is a litigation between different persons asserting conflicting titles to the same municipal offices in the city of Lexington—the appellant, *Standeford*, and appellee, *Wingate*, each claiming to be mayor, and the appellant and appellee, *Young*, and the appellant and appellee, *Gibbons*, each claiming to be attorney of said city. The city judge decided that *Young* is city attorney, and *Gibbons* appealed from that judgment. In

SUMMER TERM, 1866. 441

Standeford vs. Wingate.   Young vs. Gibbons.   Gibbons vs. Young.

a different procedure, the circuit judge having adjudged that *Gibbons* is the rightful attorney of the city, *Young* appealed from that decision; and the same circuit court having decided that *Wingate* is the legal mayor, and *Standeford* an usurper, the latter appeals from that judgment.

As all the cases were consolidated on the argument in this court, and all essentially depend on the same facts and principles, we will consider them together, and decide them as one and the same case.

The 6th section of the 6th article of the Kentucky Constitution provides, that "*Officers of towns and cities shall be elected for such terms, and in such manner, and with such qualifications, AS MAY BE PRESCRIBED BY LAW.*"

The city charter provided for the election of the mayor and subordinate officers of the city on the first Saturday in January in each year, for the term of one year—positively as to the mayor, and constructively as to the others—and declared that the term should commence immediately after the election, and that the elected officers should be installed on the first Thursday thereafter.

A statute of 1864 extended the term to two years, and, on the first Saturday in the succeeding January of the year 1865 the mayor and council were elected according to the provisions of that enactment, *Wingate* being then and thus elected mayor; and these officers were installed on the first succeeding Thursday.   The same statute having provided that the city attorney—instead of being elected as before, as the Constitution seems to have contemplated, by the popular vote—should be appointed by the mayor and council, they appointed *Gibbons* the attorney.

In February, 1866, while all these officers were claiming and exercising their respective functions, the Legislature enacted a statute repealing so much of the act of 1864 as extended the term to two years, restoring the term to the period of one year, and providing that the election should be held on the first Saturday in March in each year, instead of the first Saturday in January.   And, according to the provisions of this last enactment, *Standeford* was elected mayor,

442      D U V A L L ' S   R E P O R T S

Standeford vs. Wingate.    Young vs. Gibbons.    Gibbons vs. Young.

and *Young* city attorney; and, on the first Thursday succeeding their election, they, and the new council elected at the same time, were sworn into office; and, assuming to act officially in their respective spheres, were obstructed by the mayor, council, and attorney whom they were elected to supplant, and who insisted, and still urge, that they are the only legal officers during the term prescribed when they were elected. They stake their claim on three propositions:

1st. That the legislative curtailment of the term was unconstitutional, and therefore void.

2d. That the curtailing act fixed no time for the commencement of its operation; and that, as a general statute provided that, in such a case, such pretermitting enactment should not be in force until the expiration of sixty days after its date, there was no law in force authorizing the election in March, 1866.

3d. That the provision that the elected municipality shall be inducted into office on the first Thursday succeeding the first Saturday in January, was not repealed by the act of February, 1866; and that, consequently, *Standeford* and *Young* could not be legally installed before the first Thursday after the first Saturday in January, 1867, until which time their contestants will be entitled rightfully to hold on.

These positions will be considered in their numerical order:

1. None of these municipal offices are established by the Constitution, but all depend for their existence on ordinary legislation which created them, defined their functions, and must prescribe their terms of duration. An office established by the Constitution cannot be abolished by the Legislature, nor can an officer's term, fixed by the Constitution, be reduced or altered by an act of Assembly. But any office established by statute may be abolished by statute, unless it be a contract, which cannot be impaired by legislation. To the mind of any enlightened jurist, these contradistinctive principles are self-evident; and no truths have been more clearly established by authority, or more impressively illustrated by American history.

What the Constitution established the Legislature cannot destroy. This fundamental principle is now universally recognized, and was impressively consecrated by the "*old and new court*" controversy which agitated Kentucky for years, and finally resulted in the triumph of the "old court" of appeals, established by the Constitution, over the new court, instituted by a conflicting act of the Kentucky Legislature, attempting to supplant a tribunal ordained and established by the Constitution, and to substitute a court merely legislative.

But subordinate courts of the United States, as well as of Kentucky, derive their existence from legislative acts, by which alone they must be created, organized, and limited. And the constitutional power of Congress, and of the Kentucky Legislature, to abolish these respective courts, by repealing the laws creating them, and thereby to nullify the incidental terms prescribed by the abrogated statutes, is unquestionable.

This last proposition is authoritatively illustrated by the memorable repeal, in 1802, of the act of Congress of 1801 organizing circuit courts, and also by the prescriptive changes, by legislation, of the inferior courts of Kentucky established by statute.

An office established and held for the public good is not a contract, nor is its tenure secured by any binding contract; and a legislative office should depend for its tenure, as well as its existence, on legislative discretion. No constitutional truth is more obvious, or has been more conclusively settled in this country.

Legislative offices established for the public good depend on the popular will, and may be abolished or changed for the common welfare; and the incumbent functionaries hold, not by contract, but at the will of the Legislature.

The municipal offices of the city of Lexington, including those implicated in this case, are not established by the Constitution, but depend for their existence on legislative discretion. Even the corporation itself lives or dies by legislative will. *Nor does the Constitution define the terms of any of those*

444     DUVALL'S REPORTS.

Standeford vs. Wingate.    Young vs. Gibbons.    Gibbons vs. Young.

*offices.* It prudently defers that matter of local interest to the discretion of the Legislature, or the judgment of the people of Lexington.

The argument of this case admits that the charter might be revoked, or the offices otherwise abolished, without any violation of the Constitution.. But, nevertheless, the counsel on one side argue, that, as long as the offices exist, the terms prescribed at the time of election cannot be curtailed during the incumbency of the elected. This we cannot admit. Power to abolish an office is power to abolish or reduce its tenure. The office and its tenure are the constituent elements of the incumbent's title to the honors and profits. This title ceases constitutionally whenever the office is abolished, and he holds it, therefore, subject to the legislative will; and no office dependent on legislative will should have any other tenure than the same will. The Constitution never contemplated such an absurdity as a constitutional right of holding any such office against the public sentiment and public interest as represented and expressed by their legislative organ; and therefore it does not fix the tenure, but leaves it to be regulated by law, which is the authoritative expression of the legislative will; and, consequently, it provides only that the term shall be "such as *may* be prescribed by law—" whenever, of course, the Legislature may choose to prescribe it—there being no limitation as to the term; and had it intended any such limitation, *as the law existing at the time of the election*, it would have said so, instead of saying "for such terms as *may* be prescribed by law." Then it does seem to us that, as certainly as the whole includes all its constituent parts, power to abolish the whole is power to reduce any of its parts—that power to destroy the principal includes the power to limit the incident—and that power to annihilate the substance, implies the power to diminish the shadow.

The Constitution explicitly fixes the tenure of other offices, even those of constable. Why did it not, in like manner, put beyond legislative control the tenure of these municipal offices? Only because they were chiefly local concerns, which

ought to be regulated by the local will, as from time to time announced by the Legislature.

And although the right to enjoy these offices may be property, in a peculiar sense, and to a qualified extent, yet its tenure depends on legislative will, which may either deprive the dependent owner of that property by abolishing the office, or diminish its value by curtailing the term. When the incumbent accepts and holds by such a precarious tenure, no declamation about liberty, security, and the sacredness of property, is either applicable to his case as a functionary, or befitting the occasion of a constitutional abrogation of the office, or a discretionary curtailment of the term for promoting the common welfare. Nor would it have been compatible with the object of the city charter, or the spirit of the Constitution, in deferring the election of all such officers to the local will, to have elevated either the office, or its tenure, or its salary, above the municipal or legislative discretion.

But, however this may be, the Constitution did not give fundamental fixidity to such offices, nor, consequently, fundamental stability to their tenure. And the argument in favor of the assumed *policy* of such stability is altogether irrelevant and futile. The sovereign people, when they made their organic law, were the best and only rightful judges of that; and the inherent sovereignty of the people, and especially over their own agents, limited only by that organic law, should not be circumscribed by speculations about policy, or by any doubtful construction of their supreme law.

The value of the qualified property in an office consists of its salary and its duration; and nothing is more conclusively adjudged than that neither element is secured by contract. And it is self-evident that they both depend on the popular will, when, by their Constitution, the people have not surrendered their own power over them.

In Butler *et al.* vs. Pennsylvania, the supreme court of the United States decided, that property in a public office, not being derived from contract, the salary *and* tenure, unless fixed by the Constitution, are subject to the unlimited discretion of the Legislature. And, in that case, both the term and

446          DUVALL'S REPORTS.

Standeford vs. Wingate.   Young vs. Gibbons.   Gibbons vs. Young.

the salary prescribed by statute when an officer was elected had been reduced, so as to diminish his compensation and curtail his term. The same thing was adjudged by the supreme court of Pennsylvania in the Commonwealth vs. Bacon (6 *Sergeant and Rawle, p.* 322), and in the Commonwealth vs. Mann (5 *Watts & Sergeant, p.* 418), in which the term and the salary of a legislative office having been reduced retroactively, the court say, that, "if the salaries of the judges and *their title to office* could be put on the ground of contract, then a most grievous wrong has been done them by the people *by a reduction of tenure during good behavior to a tenure for a term of years.* The point that it is a contract, or partakes of the nature of a contract, will not bear the test of examination." This decides, that, unless the tenure and salary of an office are tenured by the Constitution, they both stand on the same frail platform of legislative discretion.

And in Taft vs. Adams (3 *vol. Gray's Massachusetts Reports, p.* 126), the court decided that the Legislature, during the incumbency of the officer, have the power to "shorten the term of office," the tenure of which is not clearly defined by the Constitution. Many other concurrent decisions might be cited. But, on such a question, adjudged cases are deemed unnecessary, except to show that a North Carolina case, hereinafter referred to, is unsupported by judicial concurrence anywhere.

Power over the salary is power over the tenure; and if the salary be reduced or abolished, why may not the term be reduced? Without salary, the term is of no appreciable value; and as to these municipal offices, the Constitution makes no allusion to salaries. How, then, can the Constitution be construed as inconsistently and uselessly fixing the tenure of the municipal offices beyond the discretion which controls the pay?

The only provision on that subject is the section already quoted, the only object of which was to prescribe popular election as the only mode of appointment. The election itself must necessarily refer to some term of service. But this does not imply that the term, whatever it then was, was

fixed by the Constitution. The mere recital in the Constitution of that which would have been implied, cannot limit legislative discretion or add any stability to the term. Had the section even said that the officers should be elected to hold "as may be prescribed by law," there could be no question that the tenure would depend on legislative discretion. The language of the section, as it is, may be admitted to be the same in effect. In neither case would the Constitution guarantee any definite term against the discretion of the law-making power, to which it is, equally in each, confided for regulating, without limit, the terms of these officers. "Such terms as *may* be prescribed by law" will be so prescribed by any change which, *at any time*, the Legislature *may* enact. And whenever or however changed, they will be, *as changed*, the "terms prescribed by law." "Elected for such terms as *may* be prescribed by law," neither imports a fundamental limitation on the power to prescribe the law of tenure at any time or in any mode the Legislature, in the exercise of a discretion limited only by its regard for the public welfare, may choose to do so, nor a constitutional guarantee that the elected shall hold by any other tenure than the popular will, however and whenever announced in the form of law "prescribed" by the Legislature. This is the literal construction of the Constitution conclusively fortified by its spirit and aim. Any other interpretation would involve the absurdity of making the tenure of an office, while the office exists, more inviolable than the office itself, and the still more flagrant inconsistency of requiring an abolition of the office before the term of holding it shall be curtailed and limited "as *may* be prescribed by law." And if this be so, then, had the tenure, at the time of election, been for the life of the incumbent, it could not be reduced against his will without abolishing the office, however unpalatable, such prolonged defiance might be to the tax-paying public, or however hurtful to its interests.

And why should the Constitution require the Legislature to abolish a proper office for the sole end of changing its incidental term? There could be no consistent motive for the ridiculous circuity of abolishing an office for the purpose of

re-establishing it only with a new and more acceptable term. Besides, what the Legislature may constitutionally do indirectly or subterraneously, it must have equal power to do directly and in open daylight.

In every instance in which the Constitution has established an office it has defined its tenure, and thus placed both the office and its tenure equally beyond legislative power. And, as to all offices created by the Legislature, the Constitution has left the tenure, as well as the office, to legislative discretion, with plenary power to regulate it by "*law*," *without any limitation as to time;* and there is no reason for entrenching the undefined tenure of a repealable office against public opinion, popular interest, and legislative power. It seems clear to us that the letter does not so import, and that the spirit and context discountenance a mal-interpretation so incongruous and illogical.

Within the range of our researches, the only adjudged case which could give any countenance to such an unreasonable doctrine, is that of Hoke vs. Henderson, in which, as reported in *4th Devereux, page 1*, the supreme court of North Carolina decided that the term of a legislative office could not be reduced below that which was prescribed when the incumbent was elected. That anomalous decision, on a Constitution not in all respects identical with ours as bearing on the same question, is not, in our opinion, sustained by consistent argument, which, with all proper respect, we regard as, in principle, *a felo de se*, even under the Constitution of North Carolina.

This court, therefore, is satisfied that the act of 1864, providing for the municipal election on the 3d of March, 1866, was unquestionably constitutional.

And were we even perplexed with doubt, as we are not, becoming deference to the intelligence of the Legislature would not allow the judiciary to denounce, as unconstitutional, a deliberate act of legislation. Even the North Carolina court, in the case just cited, announced the same wholesome and conservative sentiment which is stereotyped on the records of every American judiciary.

This opinion renders it unnecessary to decide whether Gibbons, to be constitutionally elected, ought not, like other city officers, to have been elected by the people of Lexington.

The vexation and municipal *interregnum* resulting from this litigation have hastened our decision, even though there may be doubt whether the burthens of municipal government are compensated by its blessings to such a city as Lexington.

And yet, had no constitutional question been involved, the opinion might have followed the argument without more than one day's consideration; for we do not think that on either of the other propositions there is reasonable ground for judicial difficulty or doubt.  And these we will now, therefore, very briefly consider and dispose of.

II. Although the statute of 1864 does not expressly, yet it does constructively, provide that it shall be in force before the election on the 3d of March, 1866, and long enough before to afford time for giving the required notice of ten days; and we might presume that it was intended, according to former construction, when no day was fixed, to commence operation from its passage.  The legislative intent of a constitutional statute is law, whatever may be the phraseology of the enactment; and that intent must be ascertained by the language, the end, the spirit, and the context.

The provision in this statute for an election *under its authority* clearly and necessarily implies that it was then to be vital law, operating as legal authority for the election as prescribed by it.  And this inevitable deduction is as effectual, and ought to be as satisfactory, as an express and explicit declaration to the same effect could have been; and it is equally evident that the Legislature intended that it should operate as law more than ten days before the election.

Therefore, the required notice having been given, and the regularity of the election in every other respect not being questioned, the election on the 3d of March, 1866, was legal, and entitled the persons then elected to assume, on taking the official oath, and to hold for a year succeeding their election, the respective offices to which they were called by the voice of the citizens of Lexington.

III. The statute contemplated the first Thursday after the election as the proper day for qualification and induction. As the term would expire one year after the election, it was important to fix the inauguration on an early day.   For that reason, as all the antecedent elections were on the first Saturday in January, the prescribed time for qualifying was the succeeding Thursday.   For the same reason the statute extending the term to two years, and fixing the same day in January for each biennial election, designated the first Thursday for taking the oaths of office.   Then, manifestly, the first Thursday after the first Saturday in January was synonymous with the first Thursday after the election: the first Thursday after the first Saturday in January, *because that was the day of the election*, was tantamount to the first Thursday after the election.   The day of the election being changed by the act of 10th February, 1866, to the first Saturday in March in every year, and the law fixing the first Thursday after each election as the inaugural day, the first Thursday after the first Saturday in March is that legal day.   Any other construction would be inconsistent and suicidal; for, if the first Thursday after the first Saturday in January be the prescribed day for induction, the officers elected in March of each year would hold their offices only about two months instead of a year, and there would either be an interregnum from March till January, or the officers would be elected nearly a year before they could do any official act.   We therefore adjudge that the installation of the last elected officers was not premature.

Wherefore (Judge Williams dissenting), the judgment of the city judge in the case between Young and Gibbons is affirmed; and that of the circuit judge between the same parties, and that also between Standeford and Wingate, are reversed, and these last cases are remanded to the circuit court, with instructions to dismiss the petitions of Wingate and of Gibbons.

CHIEF JUSTICE MARSHALL DELIVERED THE FOLLOWING SEPARATE OPINION:

The offices in question in these cases, though forming a part of the municipal government of the city of Lexington, are not private but public offices, created principally to meet the necessities and convenience of the local community, but forming also a part of the instrumentality by which the power and protection of the State, due to all within its territory, is to be extended to those who are within the particular municipality, and to be exercised for the preservation of their peace and safety, and for the promotion of their convenience and prosperity.

Such offices cannot themselves be the subject of private property. They are essentially public; belong to the public; are to be filled and held by the persons appointed or elected to them for the benefit of the public, whose interest requires the performance of the duties and services which, by the public will, are annexed to them; and it is to have reasonable assurance that these services will be properly performed that such compensation is allowed to the officer as is deemed sufficient and proper. It is the compensation alone that gives to the office a pecuniary value, and thus imparts to its tenure a semblance of proprietary right. And if the appointment or election to an office could be regarded as creating a contract between the public and the office; that he should hold the office according to the terms, as to time and compensation, which the law prescribed at the time of his election or appointment, the constitutional guaranty of the contract from legislative infraction would also be a guaranty of his rights under the contract. But it is well settled that no such contract arises in that way; and therefore, in those cases in which it has been considered essential to the public interest that the officer shall have a right to hold the office for a fixed period, the Constitution itself, in creating the office, has fixed the period for which it is to be held. So, where it has been deemed essential that the compensation of particular officers, as fixed when they take the office, shall be assured to them during their continuance in it, the Constitution has prohibited the diminution of it during that period. These provisions are restrictions upon

the legislative power; and there are no such restrictions with regard to municipal offices, which, by the sixth section of the sixth article of the Constitution, are to be filled by officers to be "elected for such terms, and in such manner, and with such qualifications, as may be prescribed by law."

The general power of the Legislature to create and to alter the municipal governments of cities and towns, to determine from time to time of what offices they shall consist, and to abolish such as in its opinion may be dispensed with or better supplied by others which it may create, is not denied; and that it may, from time to time, fix or alter the terms for which the officers are to be elected, and fix or alter the compensation to be received for their services, or even delegate this last power to some department of the municipal government itself, is also evident.

These powers, it is true, should always be exercised with a view to the interest of the local and general public, and we should not deny, that, in legislating for the promotion of the peace and prosperity of the local community, the feelings and judgment of that community should be to some extent regarded. The presumption must be that the Legislature, in exercising its discretion in relation to the municipal offices, acts with a view to the public good; and the question now presented is, whether a legislative act which shortens the terms for which certain officers were elected, under a previous act which had itself lengthened prospectively the pre-existing and long-established terms of the same offices, shall be deemed unconstitutional and void, because the incumbents under the preceding statute must, before the expiration of the terms as fixed by the said preceding statute, yield the offices to persons elected under the more recent act.

The idea of a contract being put out of the way, the objection made to the recent statute is, that it deprives the officers previously elected of their property or vested rights, and is, on that ground, unconstitutional. But, although the incumbents had, at all times, a vested right in the compensation previously earned, which may be regarded as property of which they could not be deprived without consent or compensation, I

cannot perceive how the incumbents of offices which are created and exist, not for their benefit, but for the benefit of the public, which the Legislature *may* abolish at will, and the emoluments of which may, at any time, be reduced at the legislative discretion, can have a vested or absolute right to be regarded as property, either in the office or in the term yet unexpired, or in the future compensation or emoluments for services not yet performed.

The right to an office is but the right to perform the duties pertaining to it, and to receive the appointed compensation therefor.   As this right cannot exist in any incumbent beyond the term for which he was elected, and as, even during the continuance of the term, the duties of the office may be changed, and the compensation of the officer may be reduced, or the office itself may be abolished, whereby the term is necessarily cut off, and the right of the incumbent to perform the duties of the office is abruptly terminated, it is clear that the election of the officer, though in terms it be to hold the office for a stated period, still leaves in the Legislature the power to be exercised at any time according to its own discretion, not only of regulating the duties and emoluments of the officer, but of annihilating the office itself, and with it the term and all future rights of the officer as such.   The tenure of these offices is limited to a term and to a succession of terms, not for the benefit of the officer, but obviously for the benefit of the public, and to the end that the successive incumbents may be frequently subjected to the peremptory judgment of the public which is interested in the performance of their duties.   The power of prescribing the terms for which municipal officers should be elected having been committed to the Legislature, it belongs equally to every succeeding Legislature.   If, therefore, the first Legislature which acted on the subject had directed, that, at the first and each successive election, certain of these officers should be elected for ten years, and others for shorter periods, the succeeding Legislatures might unquestionably have shortened such of the terms as they deemed too long, by fixing an earlier time for the election and induction of successors to the same offices; unless by the

election *for a term*, the first incumbents would have had such an absolute right in the offices for the entire period or term for which they were elected, as could not be destroyed or impaired during that period by legislative act.   But as the right of the incumbents, whatever may be its precise character, is too feeble and uncertain to preserve, on the ground either of contract or of property, the office itself from repeal, and their right in it from destruction by the Legislature, before the end of the term, my mind cannot reconcile with this admitted truth the proposition that the same right is of so firm and stable a character as to be in the constitutional sense a property in the office during the term (if the office be so long in existence), and is therefore protected against the abridging of the term by legislative act, which would, if effectual, deprive them of a portion of this property.

If the right in question be property, it is so from the time the incumbent takes the office under an election for a term, and it is no more a taking of his property to abridge the term, and thus deprive him of the office before the regular expiration of the term, than it would be to abolish the entire office, and thus to take it from him before the end of the term.

The municipal offices in this, and the terms for which they are to be held, being subject to the discretionary regulation of the Legislature, I am of opinion that the election of certain individuals for terms prescribed by one Legislature, communicates to them no such right in their respective offices as precludes a subsequent Legislature from exercising, with a view to the good of the local community, its discretionary power over the terms or tenure of the same offices; and that although, by the operation of a statute enacted under this power, the incumbents under the previous law may necessarily be deprived of their offices if other persons are elected to fill them under the new statute, they are not thereby deprived of any right which the Constitution protects from legislative action.

With these views, to which other reasoning might be added, I concur in the opinion that the statute brought in question in these cases does not violate the Constitution, and must there-

fore have its effect according to the construction given to it in the principal opinion, in which I also concur.

JUDGE WILLIAMS, DISSENTING FROM A MAJORITY OF THE COURT, DELIVERED THE FOLLOWING OPINION:

Wingate was elected mayor of the city of Lexington on the first Saturday in January, 1865, for the term of two years, and had duly qualified and was acting as such, when Standeford, claiming to be the mayor by virtue of an election on the first Saturday in March, 1866, qualified and took possession of the office.

Gibbons had been appointed and qualified as attorney for the city, by the mayor and council, in December, 1864, for the term of two years.

Young claims that he was elected city attorney at the March election, 1866, and by reason thereof claims the right to enter upon the discharge of the duties of the office and to have its emoluments. He presented himself to the city court and demanded to be inducted into the office, which Gibbons resisted; but the court permitted Young to qualify and act as such attorney, from which judgment of the city court Gibbons appeals.

He afterwards brought suit in the Fayette circuit court against Young as an usurper of the office, which is allowed by section 532, Civil Code, and the circuit court adjudged him to be an usurper, from which he has appealed.

Wingate brought suit against Standeford as an usurper, and the court having determined him to be such, he has appealed.

The election held in March, 1866, is claimed to be legal under "An act to amend the charter of the city of Lexington," approved February 10th, 1866, "chapter 496," and presents several embarrassing questions as to when the law went into effect—whether before or after such election; and when the officers elected, even if it be a legal election, should enter on the discharge of their duties by virtue of its provisions; as well as the constitutionality of so much of said act as repeals a portion of the terms of office and authorizes an election

before the expiration of the terms for which said mayor and city attorney had been previously elected.

The many inconsistent and confused provisions of this last amendment, and the repealed sections which it revives, bear the strongest intrinsic evidence that the intent, object, and effect of the act were not to operate on the offices for the public good, but to oust the then incumbents that others might be elected. And this, so far from being disguised by appellants, is expresly avowed by their attorneys, who, in their brief, say, "*that the clear and perfectly understood object of the act was to get a new election and a change of city officers at the earliest practicable moment. This is apparent from the very early day fixed for the election, as well as from the notorious facts and tenor of the petitions out of which the act grew. It will be the aim of the court to accomplish this intent of the Legislature, not to obstruct it.*"

This being the controlling, if, indeed, not the sole object, the day for the election was fixed for Saturday, March 3d, 1866, twenty-one days after the date of approval. The time when it should go into effect was not expressly provided for, so as to take it clearly without the provisions of the general statute fixing two months after the date for an act of Assembly to go into operation, unless the act should fix a different day.

The charter and amended charter then in existence fixed the first Saturday in January as the day of election, and required a list of the voters to be made out and delivered to the proper offices ten days before the *first Saturday in January*, in so many words, and also provided that those elected shall qualify and enter upon the discharge of their duties *on Thursday succeeding the first Saturday in January*, all of which were lost sight of, and leaves the charter as amended confused and incongruous, which would scarcely have been the case had the object been to regulate the *office* instead of ousting the incumbents.

By the original act incorporating the city, a mayor and city council were to be elected the first Saturday in January in each year, to hold their offices for one year, and until their successors shall be duly elected and qualified.

By an amendment of February 16th, 1864, to go into effect December 1st following, the mayor was to be elected for two

years, and until his successor should qualify.   The city council should consist of three councilmen, to be elected from each of the four wards; and under the first election, one from each ward, to hold one, two, and three years, and whose vacancies should be supplied at each annual election by a councilman to hold for three years.

By this amendment the city attorney, treasurer, assessor, &c., were to be appointed by the out-going mayor and council for two years.

The amendment of February 10th, 1866, does not repeal the various offices; does not profess to destroy the offices, but changes the duration of the term from two and three to one year; and, having thus curtailed the term of office, directs an election to fill the vacancies thus made on the first Saturday in March, 1866.

Was this within the constitutional power of the Legislature?

As was said by the supreme court of the United States in Marbury vs. Madison (1 *Cranch*, 163), this "*is a government of laws and not of men*," and the Constitution being the organic, fundamental, supreme law, whatever conflicts with its spirit and provisions is a nullity, however exalted the source of such action.

It may be safely asserted as universally recognized by the English courts as part of their common law for more than two centuries, and recognized by the judiciary of the United States and the several States—

1. That every one legally elected or appointed to an office of trust and profit *has a legal vested interest in the office for the term*, whether this be a term of years or during good behavior.

2. That the removing power is essentially judicial, and cannot be exercised by the Legislature save only when expressly allowed by the Constitution.

3. That when the Constitution designates the removing power as other than the Legislature, it cannot exercise such power.

4. That when neither the Constitution nor laws designate the removing power, it inherently belongs to the appointing or electing power, and no other can exercise it.

5. That when the Constitution designates the term, that neither one of the departments of government separately, nor all three together, can change the term.

President Adams appointed and commissioned Marbury as a justice of the peace for the county of Washington, District of Columbia, under an act of Congress of 1801, for a term of five years. This commission, however, did not reach Marbury, and Mr. Jefferson being installed as Mr. Adams' successor, his Secretary of State, Mr. Madison, refused to deliver the commission or a copy of it from the records, which is made evidence of the same grade as the original.

The supreme court having determined that the issual of the commission by the signature of the President and attestation of the Secretary of State, with the seal of the United States, constituted an appointment, though in fact the commission was not delivered to Marbury, they go on to determine his right to proceed against the Secretary of State of the United States, and say the appointment "gave the officer a right to hold for five years, independent of the Executive; the appointment was not revocable, but *vested* in the officer *legal rights*, which are protected by the laws of his country." * * * * * * "It has conferred *legal rights* which cannot be reserved." * * * . * * * "To withhold his commission is an act deemed by the court not warranted by law, but violative of a *vested legal right*."

In Wammack vs. Halloway (2 *Ala. Rep., new series,* 33), the supreme court of Alabama say: "An office is as *much a species of property as anything which is capable of being held or owned;* and to deprive one of, or unjustly withhold it, is an injury which the law can redress in a manner as ample as it can any other wrong. (2 *Black Com.,* 263; *Ibid,* 36; 4 *Bac. Abr.,* office G, 297.) *An office being a species of property, it is evident that conflicting claims to the right to hold it must be decided in the same constitutional manner as all other claims respecting property.*"

And in the case of Hoke vs. Henderson, the supreme court of North Carolina, in its able, learned, and unanswerable opinion, by Chief Justice Ruffin (1 *Devereux,* 17), say: "The sole inquiry that remains is, whether the office of which the

act deprives Mr. Henderson is property.   It is scarcely possible to make the proposition clearer to a plain mind, accustomed to regard things according to practical results and realities, than by barely stating it.   For what is property; that is, what do we understand by the term?   It means, in reference to the thing, *whatever a person can possess and enjoy by right;* and in reference to the person, *he who has that right to the exclusion of others is said to have the property.*"

These offices now in controversy being of profit and trust, the incumbents had a clear legal vested interest therein for the duration of their respective terms, unless forfeited by their own conduct, to be ascertained in a legal manner, or a total annihilation of the office.

But it is insisted, that as these offices were created by statute, that they could be repealed by statute, and that, as the Legislature could destroy the entire office, it could make a partial destruction by regulating the term and shortening it, and by subsequent legislation produce a vacancy and order this vacancy to be filled.   Let us examine this.

Offices not established by the Constitution may be created by the Legislature, as it is invested with the power of enactment for the public good.   In the exercise, therefore, of constitutional discretion, if it determines an office is demanded by the public good, it may create it, and from its judgment there is no appeal.   When it shall determine that the public good can no longer be subserved by its continuance, it may repeal the office, and from this there is no appeal.   But when it permits the office still to exist, and attempts to operate upon the term, so as to deprive the incumbents thereof, it has left the field of legislation for public good, and assumes judicial functions to oust incumbents.   And especially when it so operates upon a special case, person, or locality, it then deprives an individual of a legal vested right.

The distinction between a repeal of the *office*, and a partial repeal of a *term* of the office, is broad and intelligible.

This is perhaps the first attempt of the kind in all our history, certainly the first that has ever come under our judicial scrutiny.

As it involves interest of vast magnitude, both as concerns the public and individuals, though it was ably argued by the counsel on each side; yet, as I felt they had neither exhausted the argument nor authorities, I have examined the case with great care, and have examined every authority within my reach.   After much research I came across the case of Hoke vs. Henderson, involving the great constitutional question now under consideration, in which Chief Justice Ruffin has, with signal ability, developed the great principles of constitutional liberty, public good, and private security, and has shed a flood of judicial light upon this uncommon, and, therefore, obscure, question.

The Legislature of North Carolina, by the several acts of 1777 and 1806, authorized the appointment of clerks for the courts of the State, to "*hold their offices during their good behavior.*"   In 1832 the Legislature enacted, that, at a future designated time, popular elections should be held in each county for clerk, and that those who might be elected should qualify and act as such, &c.   Henderson had been appointed clerk of the superior court of law for Lincoln county by virtue of the act of 1806, and Hoke claimed said office by virtue of an election under the act of 1832.   Hence, the very question was involved we are now considering—the right of the Legislature to shorten the term and vacate the office.

The court said the act transfers the office of clerk from one of these parties to the other, without any default of the former or any judicial sentence of removal.   The question is whether this legislative intention, as ascertained, is valid and efficacious as being within the powers of the Legislature in the Constitution of the country.   *It depends upon the comparison of the intentions and will of the people, as expressed in their Constitution, with the intentions and will of the agents chosen under that instrument.*

The great object of society is to enable men to appropriate among themselves the things which, in their natural state, were common.   The purpose of the ordinary laws instituted by society is to protect this right from the acts and wrongs of others.   The right is yet exposed to the action of the mass

composing society; and against this there can be no effectual resistance, because sustained by physical force.   There is, however, an intermediate power—a power which resides in the body of persons on whom is conferred the authority to act in the name and with the sanction of the supposed will of the whole community.   This power is the government. The great and essential differences between governments, as distinguished from one another, consist in the greater or less personal liberty of the citizen, and the greater or less security of private right against the violence of seizure of those who are the government for the time being.   It is true, the whole community may modify the rights which persons can have in things, or at their pleasure abolish them altogether.   But when the community allows the right and declares it to exist, that Constitution is the freest and best which restrains the government from depriving a particular citizen of it.   Public liberty requires that private property should be protected even from the government itself.

The faculty to adjudicate is expressly denied to the Legislature as much as legislation is denied to the judiciary. "*Wherever an act of Assembly, therefore, is a decision of title between individuals or classes of individuals, it is essentially a judgment against the old claim of right, which is not a legislative but a judicial function.*   Wherever a right of property is acknowledged to have been in one person at one time, and held to cease in him and exist in another, *the destruction of the old one* in the former is by *sentence.   If the act of* 1832 *had been confined in its terms to the clerkship of Lincoln, its judicial character would be obvious.*"

If this act now under review had said that appellees had forfeited their offices, and that appellants were appointed, or might be elected, or had been elected, and that appellees should go out and appellants go in, it would certainly be an adjudication against their right, although the investment of the right in appellants would be legislative.

Is the act less so because it recites no cause of forfeiture? Is not the forfeiture assumed?   Can it be possible, in the nature of things, that appellants can be rightfully put in

462          DUVALL'S REPORTS.

Standeford vs. Wingate.  Young vs. Gibbons.  Gibbons vs. Young.

unless appellees are rightfully put out?    Appellees cannot be rightfully deprived unless that which they claim *was never property, or has ceased to be so, or they have parted with it by for- feiture or otherwise by their own act.*

If this act be valid, appellees are deprived without further inquiry before any court or jury or other tribunal into the fact or legal sufficiency of any cause of forfeiture or removal.

This is not a law prescribing or modifying the extent of interest or tenure *prospectively, of which these offices shall be sus- ceptible, or declaring that all interest in them shall cease by a total repeal and destruction of the offices;* but these are still preserved, and merely taken from one and given to another; and, as said by Chief Justice Ruffin, *" the only sense in which that transaction cannot be called judicial is that no court of justice could have pro- nounced the judgment under the existing laws upon the state of facts in the case.*    It is true that the act is not purely judicial, and as true that it is not purely legislative; for it leaves the nature of the office as it was in duties, powers, privileges, and emoluments, and confers it on one person as a lucrative place, *after taking it from the former possessor, who was before the acknowledged owner.*

"As far as the act is legislative, it is within the legitimate powers of the General Assembly, and the elections allowed or commanded by it are constitutional and valid, and confer a good title on the persons elected, *where a vacancy existed.*

" The question is upon the right claimed under the election to immediate induction, notwithstanding the office is already full by a previous legal appointment of another person.    To sustain this claim *the previous appointment must be vacated or the officer adjudged out.*    When the act proceeds to do this, *it becomes in that respect an adjudication.*    Although it is not purely so in all its provisions, because it does not decide *inter partes* by name, yet it partakes of that nature, and the pro- hibition of the Constitution is as imperative against the assumption of the judicial power by the Legislature, *in com- bination with their legislative authority,* as if the act were a single and simple one of direct adjudication.    Creating a right or conferring it on one, when not already vested in

another, is legislation.   So prescribing the duties of officers, their qualifications, their fees, their salaries, their powers, and the consequences of a breach of duty, including punishment and removal, are all political regulations, and fall within the legislative province.   But to inflict those punishments after finding the default, is to adjudge; and to do it *without default* is equally so, *and still more indefensible*.   The Legislature cannot act in that character; and therefore, although their act has the forms of law, it is not one of those *laws of the land* by which alone a freeman can be *deprived of his property*."

In sections 1 and 2, article 1, new Constitution of this State, it is declared, that "the powers of the government shall be divided into three distinct departments, and each of them confided to a separate body of magistracy, to-wit: those which are legislative to one; those which are executive to another, and those which are judiciary to another.

"No person or collection of persons, being of one of those departments, shall *exercise any power properly belonging to either of the others*, except in instances hereinafter expressly directed or permitted."

The only other adjudication at all involving the power to shorten a term and oust the incumbent, which I have found, is Avery vs. Inhabitants of Tyringham (3 *Mass. Rep.*, 177), decided by the supreme court of Massachusetts in 1807, which involved the right of the inhabitants to deprive their minister, Avery, of his life-tenure to an ecclesiastic office, and is, perhaps, more interesting for its curious ecclesiastical history than real pertinence to this case.

By our old Constitution the people had parted with the power to elect their officers, save the Governor, Lieutenant Governor, members of the State Legislature, Representatives in Congress, and Electors for President and Vice President of the United States; and had vested the power of appointment in the executive, legislative, and judicial departments. Nearly all of the State, district, and county officers were appointed during good behavior, which placed the incumbent beyond the control of the people or their representatives, save

by expulsion for official misconduct, either of nonfeasance, misfeasance, or malfeasance.

In the formation of the present Constitution, the people resumed the right to elect nearly all the officers, whether belonging to the executive, legislative, or judicial departments, as well as those of a ministerial character for the counties, cities, and towns, for stated periods and short terms of from two to eight years.

But in this resumption of the power of election it was not intended to exercise an absolute and despotic control over these various officers by the people, but to secure a faithful and impartial administration of their various official duties. They are, therefore, left as free and independent of the appointing power, or other power, for the duration of their term, as under the old Constitution; and for official misconduct are held responsible by impeachment, by the House of Representatives, to be tried by the Senate, including the Governor and *all civil officers.* (*Art.* 5, *secs.* 1, 2, *and* 3, *new Constitution;* 1 *Stant. Rev. Stat., p.* 140.) And by section 36, article 4, judges of the county court, justices of the peace, sheriffs, coroners, surveyors, jailers, county assessors, attorneys for the county, and constables, are made subject to indictment and removal from office for official misconduct.

By other provisions of the Constitution the judges of this court, and others, may be removed from office on the address of the Legislature to the Governor, two thirds of each house concurring.

Thus the Constitution has manifested, in the clearest terms, the intention of maintaining the independence of these officers, during their term, in the faithful discharge of their duties, by putting them beyond the control of the people, the Governor, the Legislature, or the courts, save for their own misconduct, to be investigated either by impeachment, address, or indictment.

And recognizing the long and universally established doctrine of the common law, handed down to us by our English ancestry through more than two centuries, that the incumbent of an office has a legal vested interest in it for his term, and

## SUMMER TERM, 1866. 465

Standeford vs. Vingate.   Young vs. Gibbons.   Gibbons. vs. Young.

with a tender regard to this, as to all other private vested rights, the Constitution has most amply protected them by designating three constitutional and legal ways by which only he can be deprived of this legal vested interest, to-wit: by impeachment, address, or indictment, either of which shall be upon charges, proof, trial, and judgment, and for cause, and not at the arbitrary will of any department or power; and these embrace every civil officer; it being an object of the Constitution to secure an honest, faithful, impartial administration of the duties of every officer; and to secure this he is to be held responsible for his misconduct in the ways pointed out. At the same time, to secure this impartial administration, it is designed to place him independent of popular prejudice or political animosity, either general or local, for the duration of his term, as well as to secure him in his legal vested rights by requiring charges, proof, and the judgment of his peers that he has been guilty of official misconduct, or other enormities rendering him unfit and disqualified by his own acts.

The public good requires that the officer should be capable, honest, and assiduous in the discharge of his official duties; but his political sentiments, or private views as to any public or private measure, can never be allowed to enter as an element into the faithful performance of such duties; therefore, the public good can never be subserved by making the tenure of office depend on these.

The Legislature has the undoubted right to create legal tribunals inferior to this court, and has heretofore created equity and criminal courts, with vast jurisdiction over the lives, liberty, and property of the citizen. These statutes have provided for the election of the judges of such courts, and prescribed the term of office. That these courts can be repealed and the office destroyed, when the Legislature shall deem it for the public good, there is no doubt. But does it necessarily follow, that whilst they shall determine that it is for the public good that the office shall still exist, that they can exercise the startling and absolute power of shortening

the term, and thus ousting the incumbent and virtually chang-ing the duration from a term of years to a holding at the irre-sponsible will of the Legislature?

Would not this be at war with the spirit that pervades the Constitution, as well as of the various specific provisions alluded to; a disregard of the legal vested interest of the incumbent, and a usurpation of power inconsistent with the allowances of the Constitution?

The Legislature may create an office for the public good; it may repeal the office for the general welfare.   But so long as it lets the office exist, its own incontestible judgment stands that it is for the public good, and the incumbent has a vested legal interest in the term which the Legislature cannot touch by any mere experimental legislation, however ingen-ious may be the pretext, nor however much it may urge the popular demand.

To permit this class of legislation would subject every statutory office to the control, alteration, and irresponsible will of the Legislature, and make the incumbents holders at its will and pleasure and favor, and thus reduce the independ-ence of the officers, so essential to probity and honesty, to a subserviency to the will of their legislative masters; one of the very things intended to be prevented—an evil intended to be remedied.

Popular or political prejudice against the officers, and not the public good, seems to be the moving motive, and to oust them the main object of this enactment; and is in striking contrast with all the previous amendments, which, because these looked to the public good, were made to operate upon the offices and not upon the incumbents.   Hence they were left in the undisturbed possession of the office until the expir-ation of their several terms.

We are now called on to effectuate this purpose in contra-vention of the pervading spirit and many provisions of the Constitution.

To restore to the people the election of their officers; to put an end to indefinite tenures of office, whether for good be-havior or at the will of some power in the State, and to create

stated terms of short duration by some *fixed and definite period*, at the expiration of which approbation of the incumbents could be expressed by a re-election, or else others selected; the independence of the incumbent during his term, and the protection of his legal vested rights as a reward for faithful, honest services, are among the prominent purposes of the Constitution, nearly all of which will be defeated if officers are to hold at the will of the Legislature, and be subject to legislative spoliation without charge or cause shown and adjudged.

There still remain numerous ministerial, municipal, and corporate offices for the counties, cities, and towns, which the public interest might require should be created, and, indeed, which the Constitution contemplated.

By section 41, article 4, the judges, clerks, and marshals of city and police courts, which might by law be established, shall " have the same qualifications, and shall be elected by the qualified voters of such cities or towns, at the same time and in the same manner, and hold their offices for the same terms, as county judges, clerks, and sheriffs, respectively, and be liable to removal in the same manner: " now, whilst the offices, being created by law, can be wholly destroyed by law, yet the officers must be elected by the people, and for the term, &c., the Legislature may create and may repeal the office, but can neither appoint nor confer the appointment on any other power than the people. Nor can they either make a shorter or longer term, nor in any manner remove the officer. This would still leave a very large class of city and town officers, which the public welfare might require, unprovided for, which would have been within the entire control of the Legislature, to create without restriction as to the mode of appointment or duration of the term of office, but for section 6, article 6, Constitution, which declares, that " officers for towns and cities shall be *elected* for such *terms*, and in such manner, and with such qualifications, as may be prescribed by law."

It is most apparent that, whilst the Legislature is invested with the right to create town and city offices, the Constitution requires the officers to be *elected* and for a *term*.

As said by this court in Trustees of Owensboro vs. Webb
(2 *Met.*, 576), and Speed & Worthington vs. Crawford (3 *Met.*,
212), the term "*election*" is used in the Constitution in contra-
distinction to "*appointment*," and means a popular election by
the district, county, or local community for which the office is
created, or by an organized body, such as the Legislature, &c.

And in the latter case, where an act had given to the chan-
cellor of Louisville the right to appoint two citizens as mem-
bers of the police board for said city, with power of removal
at pleasure, and to fill the vacancies, prescribing as one of the
qualifications of the appointees, that when the mayor is of
the Democratic party they shall be of the opposite political
party, and *vice versa*, this court held the act unconstitutional
on two grounds: 1. Because it authorized an *appointment* in-
stead of an *election;* and, as the court says, "2. We are next
to inquire whether the act sufficiently, or at all, prescribes
the *terms* for which the officers in question are to hold their
offices?"

"We have already seen, that by the provisions of the act
these officers may be removed at the pleasure of the chancel-
lor, and they must be removed whenever, by a change of
political opinion on their part, or on the part of the mayor,
they cease to disagree.   Such is the peculiar tenure by which
these offices are to be held.   *Can it be said that the incumbents
hold their offices for a term, within the well understood and plain
import of all the provisions of the Constitution, which prescribe the
term of the various offices therein mentioned, and which authorize
the Legislature to prescribe by law the terms of other offices?   We
think not.*

"It is deemed unnecessary to refer specially to the numerous
provisions alluded to for the purpose of demonstrating that
the word *term* is uniformly used to designate a *fixed and defi-
nite period of time.   (Trustees of Owensboro vs. Webb, supra, and
Barbee vs. Speed, MS. opinion, June term,* 1855.)   Nor shall we
stop to enlarge upon the motives of the convention in adopt-
ing the policy which those provisions were intended to em-
body and carry out.   They could not be made more manifest
by comment.   It is sufficient to say, upon this point, we con-

cur with the circuit judge in the conclusion that the act fails to comply with the requirements of the Constitution in *providing a tenure of office unknown to that instrument, and opposed, not only to its letter, but to its spirit and policy.*"

Had this act provided that these officers should hold by the tenure of the legislative will, would its unconstitutionality not have been fully as palpable, because then no *fixed and definite period of time* would have been prescribed?

Had the act provided they should hold at the will and pleasure of the Legislature for not exceeding two years, would not this have as palpably been a tenure without a fixed and definite period, and unknown to the Constitution? And yet in what consists the substantial, appreciable difference, if the power of removal be recognized in the Legislature, to be exercised at its own mere will, without cause shown, though it be by the indirect mode of partially repealing the term and providing for a new election, instead of declaring a vacancy in so many words, and ordering the vacancy to be filled?

By section 10, article 6, Constitution, it is provided, that "the General Assembly may provide for the election or appointment, for a term not exceeding four years, of such other county or district ministerial and executive officers as shall, from time to time, be proper."

Now, there was some reason for requiring a fixed and determinate period of time of sufficient importance to incorporate it in the Constitution, as found in these several sections.   What else could it be but to secure to the people the right of election, for short and definite periods, and to secure the incumbents for such term if they behaved well, and completely to put an end to the appointing power in contradistinction to the elective, and indefinite tenures in contradistinction to definite fixed periods?

It would be the merest mockery to say that the Legislature could not create an office, the tenure of which should be held at its own will, or the will of another, and yet say it could at its own will repeal any portion of the term, and thereby produce a vacancy.

The Constitution is too straightforward and dignified thus, by indirection, to trifle with the rights of the citizen, and mock him by delusive hopes.

If the officer has a vested legal right to the office during the term, to take it away from him without cause assigned and established and adjudged, would conflict with the " great and essential principles of liberty," prescribed in our " Bill of Rights," " that absolute, arbitrary power over the lives, liberty, and *property* of freemen exists nowhere in a republic— not even in the largest majority."

" Nor can (the citizen) be deprived of life, liberty, or *property,* unless by the judgment of his peers or the laws of the land."

" Nor shall any man's property be taken or applied to public use, without the consent of his representatives, and without just compensation being previously made to him." (*Secs.* 2, 12, *and* 14, *art.* 13, *new Constitution,* "*Bill of Rights.*")

But it is said, had section 6, article 6, Constitution, provided the officers should be elected to hold as may be prescribed by law, there could be no question that the tenure would depend on legislative discretion.   " The language of the section as it is may be admitted to be the same in effect."

To this it is sufficient to respond, that the section is not in language or effect the same, and no admission can change either from their direct, plain, and unembarrassed import; and beside, it is in direct conflict with the solemn adjudication of this court in Speed and Worthington vs. Crawford, on this direct point; and to overrule this adjudication by a mere change of words and admissions, without referring to it or meeting its reason, will neither conduce to the stability of our Constitution and laws, nor give stability to the settled authority of this court.

It is again urged that it is absurd to construe the Constitution as making the term more inviolable than the office; yet this very absurdity is found in section 41, article 4, which does provide that the Legislature may establish police courts for cities and towns, and that the judges, clerks, and marshals of such courts shall have the same qualifications, and shall be

elected by the qualified voters of such cities and towns at the same time, in the same manner, and hold their offices for the same term, as county judges, clerks, and sheriffs.  Now these being statutory offices, may at any time be repealed; but the duration of their term is beyond the control of the Legislature.   And the provisions of this section are illustrative of the meaning of section 6, article 6, which leaves the duration of the term within legislative discretion at its creation, but makes it equally inviolable after its creation and during the term which the incumbent holds.

These several sections manifest the clearest intent of the whole people of the State, as incorporated into their fundamental law.

But the power to reduce the term is again derived from the power to reduce the salary.  With all due respect, I may be allowed to say, this argument, to some extent, is a *felo de se*, as proving a sufficiency for its own destruction.

The power to regulate the salary, like the power to regulate the duties of the office, is clearly legislative and not judicial, and so recognized by the Constitution.   Hence the Legislature can reduce or raise the salaries of all officers, whether constitutional or statutory, except in a few specified instances wherein the Constitution forbids the reduction of those holding at the date of the enactment.   Therefore, if the power to reduce salary carries with it the power to reduce the term, the Legislature may reduce the term of nearly all the officers of the State, though the duration of the term may be fixed by the Constitution.   Thus the total unsoundness of the argument is at once perceived.

The power to regulate the salary being clearly legislative, every incumbent takes the office subject to such control, save in the particular cases within constitutional inhibitions.

However confident may be the reference to the cases of Butler *et al.* vs. Pennsylvania (10 *How.*, 414, *S. C. U. S.*), Commonwealth vs. Mann (5 *Watts & Serg.*, 418), Commonwealth vs. Bacon (6 *Serg't & Rawle*, 322), a short analysis will exhibit that neither bears even remotely upon the direct question under consideration.

In Butler *et al.* vs. Pennsylvania, the direct and immediate question before the supreme court of the United States, and the only one of which it could have had jurisdiction, was, whether the offices and salaries of State officers was a contract within the purview of section 10, article 1, United States Constitution, prohibiting the States from enacting laws impairing the obligation of contracts; and the court very properly decided, that offices created by the States for the public good did not come within the import of the term contract, as found in the United States Constitution, and no court has ever held that it did, so far as I know.

The case of the Commonwealth vs. Mann involved the right of the Legislature to reduce the salary of the president judge of the court of common pleas during his term, by a special tax laid on salaries, and within the prohibition of the following provision of the Constitution of Pennsylvania, " that the president judges of the several courts of common pleas shall, at stated times, receive for their services an adequate compensation, to be fixed by law, *which shall not be diminished during their continuance in office;* " and the court very properly decided that the compensation could not be diminished by the indirect means of specific taxation.

The case of Commonwealth vs. Bacon involved the sole question of the right of the city council to reduce the salary of the mayor during his term, and involved two inquiries: 1. Was salary and office a contract; 2. Was the reduction within any inhibition of the Constitution of Pennsylvania; and both were correctly decided in the negative.

It is fully conceded that there is much about every office, whether it be one of constitutional or statutory creation, that is legislative; and within this legislative power is that of the regulation of salaries, and equally applicable to both classes, and universally allowable, unless within some prohibition of the Constitution.

It is most apparent that neither of these cases involved the question of shortening the term and removing the incumbents, as *changing the tenure of the office from a fixed definite period of time to a holding at the will of the Legislature,* and of exer-

cising judicial functions in the ousting of officers, declaring a vacancy, and providing for its being filled.

The case of Taft vs. Adams (3 *Gray*, 129) was a case involving a change of a statute of Massachusetts authorizing a change in the manner of electing, and altering the tenure of county commissioners.

The Massachusetts court said: "Where the office is created by law, and one not contemplated, nor its tenure declared, *by the Constitution*, but created solely for the public benefit, it may be regulated, limited, enlarged, or terminated by law."

Again it says: "But although it has not been distinctly *insisted in the argument that this act is unconstitutional*, yet as it has been urged that it is unjust and imperious in its operations, it requires to be rigidly scrutinized."

And nowhere through the whole decision is it said the office was one of profit; indeed, its unconstitutionality was not insisted on nor discussed, and no allusion made to the arguments or points now urged and considered by this court, and so ably discussed by Chief Justice Ruffin in Henderson vs. Hoke. And beside, it was not an office recognized by the Constitution of Massachusetts, whilst all town offices are recognized and provided for by our Constitution.

I do not regard this Massachusetts case as even slight authority upon the question under consideration, especially as it was made under the laws and Constitution of Massachusetts, differing in many essentials from our Constitution and laws.

But it may be said, that as every enactment presupposes deliberation and consideration, that this must be regarded as a legislative construction in favor of the constitutionality of the act, and due respect for a co-ordinate branch of the government should cause the judiciary to indulge every reasonable presumption in its favor, and uphold it unless clearly unconstitutional.

When the statute is general in its character, and has been enacted after full discussion and due deliberation, the force of this is fully recognized; but when it is local in its objects and operation, and when, as in this instance, its incongruous and

inconsistent provisions irrefragibly evidence an almost total want of consideration, this presumption is greatly weakened if not totally destroyed.   And surely an essential policy of the Constitution should not be revolutionized, and vast, startling, and despotic power recognized in the Legislature merely to save a local act, illy considered and hastily adopted, especially when such legislation is condemned as unconstitutional by a harmonious judiciary, which seems to be the case relative to this subject.

The supreme court of North Carolina consisted of three judges, and there was a full concurrence in the case of Henderson vs. Hoke.   This court consisted of four judges, and no dissent in the cases of Trustees of Owensboro vs. Webb, and Speed & Worthington vs. Crawford.   No *contra* case has been referred to, nor found after diligent search, and it is believed none exists save those mentioned.

The question may, then, be thus tersely stated: *Shall the will of the whole people, as found in their well-considered and deliberately adopted fundamental law, or the will of the legislative assembly, as found in an illy considered and hastily adopted local act, prevail?*

As I hold said local act in letter, spirit, and intent, at war with the Constitution, I need not discuss the other embarrassing questions growing out of its own inconsistent and incongruous provisions, even were it constitutional, such as when it went into operation, when should the first election have been held, when should those first elected have been inducted into office, &c.   I concur, however, with the circuit judge, that even if the enactment is law, the election and induction into office of appellants were not authorized, and regard much of his reasoning as sound and logical.

It results from these views that the judgment of the city court should be reversed, and the judgments of the circuit court affirmed.