MIAL v. ELLINGTON.

(Filed December 1, 1903).

OFFICERS—*Vested Interest—Contracts—General Assembly—Const. N. C., Art. IV, sec. 33—The Code, sec. 3872.*

An officer appointed for a definite time to a legislative office has no vested property therein or contract right thereto of which the legislature cannot deprive him. *Hoke v. Henderson,* 15 N. C., 1, overruled.

CLARK, C. J., concurring.
MONTGOMERY and DOUGLAS, JJ., dissenting.

ACTION by A. T. Mial against J. C. Ellington and others, heard by *Judge R. B. Peebles* at July Term, 1903, of the Superior Court of WAKE County.

This is a civil action in the nature of a *quo warranto* tried upon the following agreed facts: At the session of 1889, Public Laws, chapter 363, an act was passed entitled, "An act providing an alternative method of constructing and keeping in repair the public roads of Raleigh Township, Wake County." It was provided by said act that the justices of the peace of Raleigh Township should meet and, if a majority so decided, adopt the method of keeping in repair the public roads of said township in accordance with the provisions of said act; that when they had so adopted the said method, it was by said act made the duty of the County Commissioners at their regular meeting and biennially thereafter to appoint a supervisor of roads for said township; that said supervisor should hold his office for two years; that in the event of a vacancy the same should be filled by said Board of Commissioners. Provision was made for removal for cause and upon notice. Said supervisor was required to qualify by taking the oath of office and giving bond in an amount to be fixed by the board. The duties prescribed for said supervisor were that he should formulate a plan for the permanent improvement of the public

roads of said township outside of the city of Raleigh by the use of the labor of county convicts and work-house hands, etc. He was required to disburse all funds paid to him upon the warrant of the County Commissioners for the purpose of carrying out the provisions of the said act and to keep an account thereof, as well as a list of all tools, etc., in his possession, and to make a report thereof to the Commissioners. The duties of the said supervisor in all other respects were specifically pointed out in the several sections of said act. His compensation was to be fixed by the Board of Commissioners, but the same was not to exceed $750 per annum. Pursuant to the provisions of said act, the method prescribed therein for the roads of Raleigh Township was duly adopted by the justices of the peace and a supervisor duly elected. At the session of 1891, Public Laws, chapter 218, the maximum limit of the salary of the supervisor was fixed at $1,200. At the session of 1897, Public Laws, chapter 434, the provisions of said act were extended three miles beyond the present limits of Raleigh Township in each direction.

That at the regular meeting of the Board of Commissioners of Wake County, held in December, 1902, one Bryant Harrison was appointed by the said board to be Supervisor of Roads of Raleigh Township for a term of two years, commencing January 1, 1903. That the said board fixed his salary at $70 per month, and that the said Harrison duly qualified and entered upon the discharge of his duties as such officer.

That at the February meeting of said Board of Comissioners the said Harrison resigned the said office, to take effect on March 1, 1903, and thereupon the board accepted the said resignation and called a special meeting to be held on February 21, 1903, to appoint a successor. That at said special meeting the relator, A. T. Mial, was duly appointed to fill out the said unexpired term and his salary fixed at $70 per month. That he subsequently gave the required bond, took

the oath of office and was duly inducted therein and entered upon the discharge of his duties as such officer.

That at the session of 1903, the General Assembly enacted chapter 551, an act entitled, "An act to improve the public roads of Wake County." By said act it was provided that the Board of County Commissioners of Wake, in order to provide for the proper construction, improvement and maintenance of the public roads of the county, shall on or before January 1, 1904, elect a superintendent of roads for the county, who shall hold office until December, 1904, and until his successor has been elected and qualified, and at their regular meeting in December, 1904, and biennially thereafter, they shall elect a successor to said office. The superintendent of roads shall be paid such compensation as shall be fixed by said board out of the county road fund, and hold office for two years and until his successor has been elected and qualified. * * * It shall be the duty of said superintendent of roads, subject to the approval of the Board of Commissioners, to supervise, direct and have charge of the maintenance and building of all public roads in the county, and he shall submit to the County Board of Commissioners a monthly report concerning the work in progress and the moneys expended, and he shall submit a quarterly report on the condition of the public roads and bridges and plans for their improvement. That the Board of Commissioners shall divide the county into three road districts, to be known as the Raleigh, the Northern and the Southern Road Districts, respectively. The boundary of the Raleigh Road District shall be the circumference of a circle, the radius of which shall extend eight miles from the Capitol building, in the city of Raleigh, in every direction; and the boundaries of the other districts shall be fixed by the Board of County Commissioners, and said board shall have power to create new road districts whenever in their opinion there is necessity for the same,

and to alter the boundaries of any district, except the Raleigh Road District, when they may consider it advisable. For each of the road districts the County Commissioners shall elect, at the time herein prescribed for the election of the road superintendent, a district supervisor, who shall hold office for the same term and in the same manner that he holds, and until their successors are elected and qualified. Each supervisor shall give bond in the sum of $1,000 for the faithful performance of the duties of his office, the truthful accounting for all moneys coming into his possession and the proper care of all teams, wagons, machinery, tools and implements entrusted to his charge; and they shall furnish inventories of such material, tools, implements, machinery and utensils of every nature that shall come into their hands upon their entrance upon and retirement from office; they shall be paid such compensation as shall be fixed by the Board of County Commissioners, and may be removed from office in the same manner provided for the road superintendent.

The County Commissioners shall furnish each supervisor with a complete outfit of teams, carts, machinery, implements, tools and utensils for use by him upon the roads of his district, and the machinery, tools, implements and property now belonging to the Raleigh Road District shall not be used upon the roads of any other district, but shall be kept for the exclusive use of that district.

The work of the supervisors in each district shall be under the direction and control of the superintendent of roads, and they shall faithfully conform to his directions and the requirements of this act. There shall be kept continuously employed upon the roads of each district a squad of not less than fifteen hired hands, whose compensation shall be fixed by the Board of Commissioners.

That at the regular meeting of the said Board of Commissioners held in April, 1903, the said board caused public

notice to be given that at the regular May meeting of the said board a superintendent of roads for Wake County and three supervisors for the respective road districts of said county would be eleced by said board, under said chapter 551, Laws 1903, and in pursuance of said notice at said May meeting the Board of Commissioners elected the defendant J. C. Ellington Superintendent of Roads for Wake County, and the defendant Alfred Jones Supervisor for the Raleigh Road District, and I. N. Bailey and A. R. Holloway Supervisors for the Northern and Southern Road Districts of Wake County, respectively. That the relator, A. T. Mial, was not a candidate or applicant for either of these positions. That the defendants J. C. Ellington and Alfred Jones, prior to the commencing of this action, gave the bond and took the oath of office, and did all other acts required of them by the said act of March 6, 1903. Thereafter, on the 12th day of May, 1903, acting under the order of the defendants, the Board of Commissioners of Wake County, the said J. C. Ellington took possession of the teams and other property and effects belonging to Raleigh Township and then in the custody of the relator, A. T. Mial, by virtue of his office aforesaid, in the absence of said Mial and without his consent; and on the said 12th day of May the defendants, the Board of Commissioners of Wake County, withdrew all the convicts, guards and officers in their custody, and which worked upon the roads of Raleigh Township, and over whom the relator, A. T. Mial, had supervision, and placed them under the charge and supervision of the defendant J. C. Ellington. That thereafter, on said May 12, 1903, the relator, A. T. Mial, demanded the return to him of all of the said property and effects, also control of the convicts, guards and officers, and that the same was refused by the defendants. That at the said May meeting, 1903, the Board of Commissioners of Wake County, in pursuance of the said act of March 6, 1903, fixed the boundaries of the Northern

and Southern Road Districts of Wake County, the boundaries of the Raleigh Road District having been fixed by the said act, and included the territory formerly within Raleigh Township, under the said act of 1899 and all the acts amendatory thereof, and also included certain territory in addition thereto.

The Court, upon the foregoing agreed facts, rendered judgment for the defendants, and the relator appealed.

*Battle & Mordecai* and *Womack & Hayes,* for the plaintiff.
*B. M. Gatling,* for the defendants.

CONNOR, J. We have no disposition in the decision of this case to place the conclusion to which we have arrived upon the ground that the position of supervisor of the roads, the title to which is in controversy, is not a public office. Adopting the settled definition of a public officer, we hold that the position comes clearly within such definition. Nor are we disposed to enter into a discussion of the many fine and delicate distinctions which have been made between the validity of an act which distributes the duties of an office and one which abolishes the office. We prefer rather to discuss and decide the question, which is fairly presented by this record, whether an officer appointed for a definite time to a legislative office has any vested property interest or contract right to such office of which the Legislature cannot deprive him. The contention of the relator is based upon the proposition which was decided by this Court in *Hoke v. Henderson,* 15 N. C., 1, which is thus stated by *Ruffin, C. J.:* "The sole inquiry that remains is whether the office of which the act deprives Mr. Henderson is property. It is scarcely possible to make the proposition clearer to a plain mind, accustomed to regard things according to practical results and realities, than by barely stating it. For what is *property;* that is, what do we understand by the term? It means, in reference to the thing,

whatever a person can possess and enjoy by right; and, in reference to the person, he who has that right to the exclusion of others is said to have the property. That an office is the subject of property thus explained is well understood by every one, as well as distinctly stated in the law books from the earliest times. An office is enumerated by commentators on the law among *incorporeal hereditaments;* and is defined to be the right to exercise a public or private enjoyment and to take the fees and emoluments thereunto belonging. A public office has been well described to be this: when one man is specially set by law, and is compellable to do another's business against his will and without his leave, and can demand therefor such compensation by way of salary or fees as by law is assigned; to the doing of which business no other person but the officer, or one deputed by him, is legally competent." This proposition was stated by the great Chief Justice and maintained in an elaborate opinion at the December Term, 1833, of this Court. That it has been frequently cited with approval and, with some exceptions, followed by this Court, cannot be denied; nor can it be successfully denied that there has always been a number of the ablest members of the Bar in North Carolina who have questioned its soundness.

The contrary view is thus stated by *Sanford, J.,* on *Conner v. City of New York,* 2 Sanford's Reports, 370: "We think it must be assumed that there is no contract, express or implied, between a public officer and the government whose agent he is. The latter enters into no agreement that he shall receive any particular compensation for the time he shall hold office; nor, in the case of a statutory office, that the office itself shall continue any definite period. Where the Constitution limits the compensation it is beyond legislative control; but that makes no contract. The people have the control, in their sovereign capacity, as the Legislature has in statutory offices. It is not the question whether fees or salary earned may be

divested. The right to receive such fees may be conceded as perfect, without affecting the present inquiry."

In *Taylor v. Beckham*, 178 U. S., 577, *Fuller, C. J.,* thus states the law as held and enforced by that Court: "The decisions are numerous to the effect that public offices are mere agencies and trusts and not property as such. Nor are the salary and emoluments property, secured by contract, but compensation for services actually rendered. Nor does the fact that a Constitution may forbid the Legislature from abolishing a public office, or diminishing the salary thereof during the term of the incumbent, change its character or make it property. True, the restrictions limit the power of the Legislature to deal with the office, but even such restrictions may be removed by constitutional amendment. In short, generally speaking, the nature of the relation of a public officer to the public is inconsistent with either a property or a contract right."

We have thus presented the two views upon this most important question, and we are confronted with the necessity of either overruling or rejecting the theory upon which *Hoke v. Henderson* is based or that which is stated in the cases cited as what may be called the American doctrine in respect to the relation which the public officer bears to the State. It will save any possible confusion or misunderstanding to say that nothing said by us in regard to the power of the Legislature applies to offices provided for by the Constitution. These are beyond the power of the Legislature to affect, either in respect to the term or, except within the limitations fixed, the salary. This, not because there is any property right in the office, but because the people in their Constitution have made provision for and regulated their terms and salaries.

The proposition involved in this appeal on behalf of the plaintiff is that neither an office, or the duties thereof, created by an act of the Legislature, fixing the term and compensa-

tion, can be transferred to some other person or affected during the term for which the incumbent has been elected; that such office is property within the protection of the constitutional provision that no person shall be deprived of his property except by due process of law, and that no State shall pass any law impairing the obligation of a contract, which, of course, excludes the power of the Legislature to take property from one man and give it to another.

We recognize the gravity of the proposition that we shall reverse a decision of this Court, delivered by *Chief Justice Ruffin,* with the approval of *Justices Daniel* and *Gaston,* which we concede has received the unanimous approval of this Court in a number of cases, and a majority thereof in many others. If this were a question involving the title to property, upon the decision of which property rights have been acquired, settlements have been made, and the security and peace of families was dependent, we should feel it our duty to leave it to the legislative department of the Government to bring the law into harmony with sound principle and the best thought and experience of the age in which we live. Being, however, a question of public constitutional law, involving the sovereignty of the State, if it is made to appear that the principle upon which *Hoke v. Henderson* is founded stands without support in reason and is opposed to the uniform, unbroken current of authority in both State and Federal Courts, it becomes our duty to overrule it and place our jurisprudence in line with that of the other States and the Federal Government.

It is said by *Douglas, J.,* in *Caldwell v. Wilson,* 121 N. C., 467, that, "with the exception of this State, it is the well-settled doctrine in the United States that an office is not regarded as held under a grant or contract, within the general constitutional provision protecting contracts; but, unless the Constitution otherwise expressly provides, the Legislature has power to increase or vary the duties, or diminish the salary

MIAL *v.* ELLINGTON.

or other compensation appurtenant to the office, or abolish any of its rights or privileges before the end of the term, or to alter or abridge the term, or to abolish the office itself.  *   * Except in North Carolina, it is well settled that there is no contract, either express or implied, between a public officer and the Government whose agent he is; nor can a public office be regarded as the property of the incumbent."

We deem it proper, in view of the conclusion to which we have arrived, to review at some length the elementary principles involved and the authorities in the United States.

It is stated by *Mr. Freeman,* in his note to *Hoke v. Henderson,* 25 Am. Dec., 704, that, "With all deference to the North Carolina Courts, the conclusion may yet be drawn, with *Mr. Pomeroy,* that 'It may, therefore, be considered as a settled point of constitutional law, settled by both the National and State Courts, that a public office bears no resemblance to a contract; and that the Legislatures have full power over the public offices of a Commonwealth, except so far as they may be restrained by the local constitutions.  The clause of the United States Constitution which prohibits State laws impairing the obligation of contracts has no application whatever to this subject.' "

*Chief Justice Marshall,* in *Woodard v. Dartmouth College,* 4 Wheat., 627, said: "Public offices are not within the inhibition of the Constitution of the United States against laws impairing the obligation of contracts; that the inhibition does not extend to offices within a State for State purposes; that the Legislature must necessarily control such offices and may change and modify the laws concerning them as circumstances may require; that grants of political power to be employed in the administration of the government are to be regulated by the Legislature of each State according to its own judgment, unrestrained by any limitations of its power imposed by the Constitution of the United States."   In the same case

*Mr. Justice Story* said: "The State Legislatures have power to enlarge, repeal or limit the authority of public officers in their official capacity in all cases when the Constitution of the States respectively do not prohibit them; and this, among others, for the very good reason that there is no express or implied contract that they shall always, during their continuance in office, exercise such authorities. They are to exercise them only during the good pleasure of the Legislature."

In *Butler v. Pennsylvania,* 10 How. (U. S.), 402, *Mr. Justice Daniel* says: "The contracts designed to be protected by the tenth section of the first article of that instrument are contracts by which perfect rights, certain, definite, fixed private rights of property are vested. These are clearly distinguishable from measures or engagements adopted or undertaken by the body politic or State Government for the benefit of all, and from the necessity of the case, and according to universal understanding, to be varied or discontinued as the public good shall require. The selection of officers, who are nothing more than agents for the effectuating of such public purposes, is matter of public convenience or necessity, and so, too, are the periods for the appointment of such agents; but neither the one nor the other of these arrangements can constitute any obligation to continue such agents, or to reappoint them, after the measures which brought them into being shall have been found useless, shall have fulfilled, or shall have been abrogated as even detrimental to the well-being of the public. * * * We have already shown that the appointment to and tenure of an office created for the public use, and the regulation of the salary fixed to such an office, do not fall within the meaning of the section of the Constitution relied on by the plaintiffs in error; do not come within the import of the term *contracts,* or, in other words, the vested private personal rights thereby intended to be protected."

*Mr. Justice Lamar,* in *Crenshaw v. United States,* 134

MIAL v. ELLINGTON.

U. S., 99, 104, says: "The question is whether an officer appointed for a definite time or during good behavior had any vested interest or contract right in his office of which Congress could not deprive him. The question is not novel. There seems to be but little difficulty in deciding that there was no such interest or right."

In *Newton v. Commissioners*, 100 U. S., 559, *Mr. Justice Swayne* says: "The legislative power of a State, except so far as restrained by its own Constitution, is at all times absolute with respect to all officers within its reach. It may at pleasure create or abolish them or modify their duties. It may also shorten or lengthen the term of service. And it may increase or diminish the salary or change the mode of compensation. * * * In all these cases there can be no contract and no irrepealable law, because they are 'governmental subjects,' and hence within the category before stated. * * A different result would be fraught with evil."

We do not find a suggestion from the Federal judiciary which in the slightest degree questions the authority of the cases cited. The only case to which our attention has been directed, in which *Hoke v. Henderson* is referred to by the Supreme Court of the United States in connection with an office, is *Ex parte Hennen*, 13 Peters (38 U. S.), 230. That was a rule upon a district judge to show cause why he should not reinstate a clerk who had been removed by him. There was no constitutional principle involved. It was simply a question whether the judge, under the statute, had the power of removal. The Court said: "The tenure of ancient common law offices and the rules and principles by which they are governed have no application to this case. The tenure in those cases depends in a great measure upon ancient usage. But with us there is no ancient usage which can apply to and govern the tenure of offices created by our Constitution and laws. They are of recent origin and must depend entirely

upon a just construction of our Constitution and laws." The Court proceeds to say: "The case of *Hoke v. Henderson,* 4 Dev., decided in the Supreme Court of North Carolina, is not at all in conflict with the doctrine contained in the cases referred to. That case, like the others, turned upon the Constitution and laws of North Carolina; and by the express terms of the law the tenure was during good behavior, and was, of course, governed by very different considerations from those which apply to the case now before the Court." The rule was discharged. There was no suggestion of a property right in the office.

Returning to the State Courts, we find in *Conner v. City of New York, supra,* after discussing the opinion in *Hoke v. Henderson,* the learned Justice says: "It appears to us, with much respect for the learned tribunal which pronounced this judgment, that it was unduly influenced by the common law rule derived from prescriptive offices, and operating in a government whose genius and spirit are perhaps in no more respect unlike ours than in this very subject, the source and nature of the rights and interests acquired by public officers. In enumerating the qualities of an office, considered as property, the Court admitted that it was inalienable, and in many instances incapable of being managed by a substitute; and in the only point giving it the semblance of value, subject entirely to legislative control. If to those be added the consideration that it is a political agency, and not like a private contract of hiring for a definite period, we think there will remain no incident of *property* in its correct signification." This cause being before the Court of Appeals, in 5 Selden, 301, *Ruggles, C. J.,* concludes the opinion of the Court as follows: "*Mr. Justice Sanford* has referred to so fully, and reviewed so judiciously, the authorities on the proposition under consideration, that it appears unnecessary to re-examine them. My judgment accords with his conclusion, viz., that

'these authorities, with the nature of the duties and employment of a public officer, seem conclusively to show that such an officer has no *properly* in the prospective compensation attached to his office, whether it be in the shape of a salary or fees.' "

In 1834, *Nicholl, J.,* in the case of *State v. Dews,* R. M. Charlton's Reports (Ga.), 397, in discussing the same question, uses the following language: "That a public office is the property of him to whom the execution of its duties is entrusted, is repugnant to the institutions of our country, and is at issue with that universal understanding of the community, which is the result of those institutions. Public officers are, in this country, but the agents of the body politic, constituted to discharge services for the benefit of the people, under laws which the people have prescribed. So far from holding a proprietary interest in their offices, they are but naked agents without an interest. As public agents they are entrusted with the exercise of a portion of the sovereignty of the people—the *jus publicum*—which is not the subject of a grant, and can be neither alienated or annihilated, and it would be a repugnant absurdity, as incomprehensible as it would be revolting, that they can have a private property in that sovereignty. Unlike those officers in England, whose offices are treated as property, they do not hold under *grant,* but their authority or function to discharge the duties of their offices is *delegated* to them by *commission.* In those instances in which in England the right to offices has been regarded as property, the instrument of conveyance has been technically a grant, a conveyance by which an estate is passed or purchased, and employing the technical terms of a grant, *dedi et concessi.* But from the organization of the first republican government of this State, officers have been appointed by *commission,* a term which, whether regarded according to its ordinary meaning or its legal sense, imports a delegation of author-

ity. And our earliest books draw a distinction between a grant of an office and a commission, and inform us that the former, as its name implies, is not revocable, but that the latter, which is only the delegation of an authority, is. The title exhibited by the defendant himself in his return, and by which only he can vindicate his possession, is that he has been duly elected sheriff, and has been duly *commissioned* and qualified. He claims, therefore, not by grant, but under commission, and that commission commits to him only an authority, without an interest. The title of the defendant is not by a grant, which passes an estate, but by a commission, which is a delegation or warrant of authority, and which, so far from passing an estate, is founded upon and is an affirmance of the fact that the estate is not in him, but in those from whom the power proceeds. It confers upon him the title to exercise the authority, but the subject of that authority is in the principal and under his control, and the very authority of the agent is evidence of it. Every authority implies a perfect right in the grantor to the extent of that authority, at least as between him and the agent, and it is perfectly insensible that because of such agency the agent becomes armed with a control over the exercise of that right."

It will be observed that *Judge Ruffin* says: "An office is enumerated by commentators on the law among *incorporeal hereditaments.*" *Judge Nicholl,* dealing with that phase of the question, says: "As property, offices are classed under the head of incorporeal hereditaments, and must be held under a conveyance to a man and his heirs, or, at least, a freehold interest must be held in them. Nor can an action be maintained for an injury resulting from a disturbance or interference with an office, unless it be an incorporeal hereditament or a freehold."

It is well settled that in the United States a public office

134——10

is not and cannot in the very nature of our government be an incorporeal hereditament.   3 Kent (13 Ed.), 454.

This question came before the Supreme Court of South Carolina, in *Alexander v. McKenzie,* 2 S. C., 81, when *Willard, J.,* delivered an exhaustive opinion.   He says: *"Hoke v. Henderson,* 4 Dev., N. C. R., 1, holds the contrary doctrine, but is without the support of reason or authority.   Misapprehension of the English doctrine on this subject has frequently given rise to erroneous views of the powers of political bodies."   The Court adopted the view of the New York Court in *Conner v. City of New York, supra.*

In *Standeford v. Wingate,* 63 Ky., 440, the Supreme Court of Kentucky thus states the conclusion reached upon the question: "An office established and held for the public good is not a contract, nor is its tenure secured by any binding contract."   *Roberson, J.,* in the opinion of the Court, at page 448, says: "Within the range of our researches, the only adjudged case which would give any · countenance to such an unreasonable doctrine is that of *Hoke v. Henderson,* in which, as reported in 4 Dev., page 1, the Supreme Court of North Carolina decided that the term of a legislative office could not be reduced below that which was prescribed when the incumbent was elected.   That anomalous decision, on a Constitution not in all respects identical with ours as bearing on the same question, is not, in our opinion, sustained by consistent argument."

The Supreme Court of Maine, in *Prince v. Skillin,* 71 Me., 361, 36 Am. Rep., 325, says: "All offices, except when legislative authority is limited or restricted by constitutional provisions, are subject to the will of the Legislature.   There is, with this exception, no vested right in an office or its salary."

In *Kendall v. Canton,* 53 Miss., 526, *Chalmers, J.,* in the opinion of the Court, says: "Counsel for the plaintiff are correct in saying that while an election or appointment to office

is not a contract in its broadest sense, it does so far partake of the attributes of a contract as to entitle the incumbent to recover all salary accruing during his incumbency; but there is no demand here for salary earned and in arrear. The action sounds wholly in damages, and proceeds upon the idea of a vested right to hold for the full term for which the plaintiff had been elected. Nothing is better settled than the legislative power to terminate at pleasure the incumbency of a statutory office, either by an abolition of the office itself *or by a change in the tenure or the mode of appointment."*

*Cole, J.,* in *State v. Douglas,* 26 Wis., 428, 7 Am. Rep., 87, says: "It was not claimed that the plaintiff had any vested right in his office which the Legislature could not abrogate or destroy. Such a position would be clearly untenable upon the authorities, and as a principle utterly inadmissible under our form of government."

In *State ex rel. v. Davis,* 44 Mo., 129, the Court, speaking of the plaintiff's case, says: "It proceeds upon the theory that a person in the possession of a public office created by the Legislature has a vested interest, a private right of property, in it. This is not true of offices of this description in this country; they are held neither by *grant* nor by *contract.* A mere legislative office is always subject to be controlled, modified or repealed by the body creating it. In England offices are considered *incorporeal hereditaments,* grantable by the Crown and a subject of vested or private interests. Not so in the American States; they are not held by grant or contract, nor has any person a private property or vested interest in them, and they are therefore liable to such modifications and changes as the law-making power may deem it advisable to enact."

In *Robinson v. White,* 26 Ark., 139, the Supreme Court of that State has decided that "The office of an assessor is a statutory office, and the Legislature has absolute control over

all statutory offices and may abolish them at pleasure, and in so doing no vested right is invaded."

In *People ex rel. v. Van Gaskin*, 5 Mont., 352, the conclusion to which the Court arrived is stated to be that, "In the absence of constitutional restrictions, a Legislature, having power to create a particular office and to regulate the manner in which it should be filled and the term and duties of the incumbent, has the power to lengthen or abridge such term, *or to declare the office vacant and appoint another to fill the vacancy.* The exercise of such power by the Legislature would not be in violation of section 10, Article I of the United States Constitution, prohibiting a State from passing any law impairing the obligations of contracts, or of the Fifth Amendment thereof, providing that no one shall be deprived of property without due process of law."

The Supreme Court of Nevada, in *Denver v. Hobart*, 10 Nev., 28, says: "The Legislature having by the act of March 4, 1865, vested certain duties upon the Lieutenant-Governor, and allowed him a salary for his services, *it was within the power of the Legislature to take those duties and the salary away from him before the expiration of his term of office and confer them upon another."*

*Shaw, C. J.*, in *Taft v. Adams*, 3 Gray (Mass.), 126, says: "When an office is created by law, and one not contemplated nor its tenure declared by the Constitution, but created by the law solely for the public benefit, it may be regulated, limited, enlarged or terminated by law as public exigency or policy may require."

In *Wyandotte v. Drennan*, 46 Mich., 478, *Cooley, J.*, says: "This is a position that has frequently been taken and almost as often overruled. Nothing seems better settled than that an appointment or election to public office does not establish contract relations between the person appointed or elected and the State. Offices are created for the public good at the will

of the legislative power, with such powers, privileges and emoluments attached as are believed to be necessary or important to make them accomplish the purposes designed. But except as it may be restrained by the Constitution, the Legislature has the same inherent authority to modify or abolish that it has to create, and it will exercise it with the like considerations in view."

In *Attorney-General v. Jochim,* 99 Mich., 358, 23 L. R. A., 699, 41 Am. St. Rep., 606, the Court uses the following language: "The Legislature may remove officers not only by abolishing the office, but by declaring it vacant. * * * And it may lodge the power to remove from statutory offices in boards or other officers subject to statutory regulations. And while it cannot remove the incumbent of constitutional offices, it is not because of an inherent difference in the qualities of the office, but because the power to remove is limited to the power that creates. The constitutional officer is an agent of the government. There is the same lack of the ingredients of contract and the same power to abolish the office or remove the officer by amendment of the Constitution." In this case the Fourteenth Amendment was invoked and expressly held not applicable. "A public office cannot be called 'property' within the meaning of these constitutional provisions. If it could be, it would follow that every public officer, no matter how insignificant, would have a vested right to hold his office until the expiration of the term. Public offices are created for the purpose of government." *Ibid.*

*Andrew, J.,* in *Nichols v. McLean,* 101 N. Y., 526, 54 Am. Rep., 730, says: "It is true that in this country offices are not hereditaments, nor are they held by grant. The right to hold an office and to receive the emoluments thereof belonging to it does not grow out of any contract with the State, nor is an office property in the same sense that cattle or land are the property of the owner." *Kreitz v. Behrensmeyer,* 149 Ill., 496, 24 L. R. A., 59; *Jones v. Shaw,* 15 Texas, 577.

"An appointment is neither a contract, nor is the office or
its prospective emoluments the property of the incumbent.
Upon general principles of law the office itself and its emolu-
ments are within the control of the government, and the legis-
lative branch of the government, whenever in its judgment
public policy requires it, may declare the office vacant, or
*transfer its duties* to another officer before the expiration of
the term for which he was appointed." *Kenny v. Hudspeth,*
59 N. J. Law, 320.

In *Foster v. Jones,* 29 Va., 642, 52 Am. Rep., 637, the
Court uses the following language: "We think it may be
fairly assumed in the outset to be an undeniable proposition
that the two branches of the Legislature, as the direct repre-
sentatives of the people, have the right, where no restrictions
have been imposed upon them, either in express terms or by
necessary implication, by the Constitution, to create and abol-
ish offices accordingly as they may regard them as necessary or
superfluous.  And they may also under like circumstances
deprive the officers of their salaries, either directly by remov-
ing them from office or indirectly by so changing the organi-
zation of the department to which they are attached as to
leave them without a place."  Mechem on Pub. Officers, sec.
463, *et seq.;* Throop on Pub. Off., sec. 1719; 23 Am. & Eng.
Enc. of Law, 328.

In the case of *State v. Hawkins,* 44 Ohio St., 109, *Min-
shall, J.,* says: "The incumbent of an office has not, under
our system of government, any property in it.  His right to
exercise it is not based upon any contract or grant.  It is
conferred on him by the public trust, to be exercised for the
benefit of the public.  Such salary as may be attached to it
is not given him because of any duty on the part of the public
to do so, but to enable the incumbent the better to perform
the duties of his office by the more exclusive devotion of time
thereto."

In the case of *Donahue v. Will Co.,* 100 Ill., 94, it is said: "It is impossible to conceive how, under our form of government, a person can own or have title to a governmental office. Offices are created for the administration of public affairs. When a person is inducted into an office he thereby becomes empowered to exercise its powers and perform its duties, not for his, but for the public benefit. It would be a misnomer and a perversion of terms to say that an incumbent owned an office or had any title to it."

"Some of the decisions have adopted the theory that an office is property, under a mistaken view that the common law doctrine that an office is an hereditament applied to offices of this country, which is undoubtedly fallacious. * * * Public offices belong to the people, and are to be both conferred and taken away according to their will and appointment, and a person who accepts a public office does so subject to all the constitutional and legislative provisions in relation thereto." *Moore v. Strickland,* 46 W. Va., 515, 50 L. R. A., 279. The Court in this case refers to *Hoke v. Henderson,* and expressly rejects the doctrine enunciated therein. A careful research fully sustains the remarks of *Mr. Justice Douglas, supra.*

Mr. Irving Browne, in his note to *Grant v. Secretary of State for India,* 8 Eng. Rul. Cas., 266, states the doctrine as held in the cases cited by us with this conclusion: "Both the office itself and the compensation, upon general principles of law, are naturally within the control of the government to diminish, increase or abolish. This is the general doctrine as to statutory offices in this country. An appointment to an office is not a contract, the impairment of the obligation of which is forbidden by the Federal Constitution." *He notes the single exception in the North Carolina Court and says: "In all the other States* the Legislature may do what it pleases with such offices unless it is expressly restrained by the Consti-

tution, an office not being regarded as property nor the subject of contract in any sense."

It will be observed that *Chief Justice Ruffin* cites no authority for the proposition maintained by him. He contents himself with the statement that "An office is enumerated by commentators on the law among the *incorporeal hereditaments.*" And while, therefore, they are property, he says that "most of the rules regulating them have reference to the discharge of the duties and the promotion of the public convenience. They are *pro commodo populi,* hence they are not the subject of property in the sense of that full and absolute dominion which is recognized in many other things. They are only the subject of property so far as they can be so in safety to the general interest involved in the discharge of their duties."

He concedes that the office may be abolished. "With these limitations and the like," says he, "a public office is the subject of property as everything *corporeal* and *incorporeal* from which man can earn a livelihood and make a gain. And to the extent of his salary it is private property as much as the land which he tills, or the horse which he rides, or the debt that is owing to him."

We must confess our inability to see how the right to the salary can have any higher or stronger ground upon which to rest than the right to the office. The salary is but an incident to the office. The Chief Justice does not express himself with his usual force and clearness when he says that offices "are not the subject of property in the sense of that absolute dominion which is recognized in many other things," and yet, "to the extent of his salary, it is private property as much as the land he tills, or the horse which he rides, or the debt which is owing to him." When he concedes that the office may be abolished, such concession very greatly weakens the force of his conclusion.

. In *Mills v. Williams,* 33 N. C., 558, *Pearson, J.,* in his

usual clear and concise style, thus states the distinction be-
tween legislation which is contractual and that which is not.
In discussing the power of the Legislature to repeal an act
establishing a county, he says: "The substantial distinction
is this: Some corporations are created by the mere will of the
Legislature, there being no other party interested or concerned.
To this body a portion of the power of the Legislature is dele-
gated, to be exercised for the public good and subject at all
times to be modified, changed or annulled.  Other corpora-
tions are the result of contract," referring to private corpora-
tions.  The same distinction was made and the same prin-
ciple clearly enunciated by *Ruffin, C. J.,* in *University v.
Maultsby,* 43 N. C., 257.  He says: "But the Court is fur-
ther of the opinion that the University is a public institution
and body politic, and hence subject to legislative control.
* * * And therefore the corporation was not originally
the creature of the Legislature, but is dependent on its will
for its continuing existence."

"A grant of land by a State is a contract, because in mak-
ing it the State deals with the purchaser precisely as any
other vendor might; and if its mode of conveyance is any dif-
ferent it is only because by virtue of its sovereignty it has
power to convey by other modes than those which the general
law opens to individuals.  But many things done by the State
may seem to hold out promises to individuals which, after all,
cannot be treated as contracts without hampering the legisla-
tive power of the State in a manner that would soon leave it
without the means of performing its essential functions.  The
State creates offices and appoints persons to fill them; it estab-
lishes municipal corporations with large and valuable privi-
leges for its citizens; by its general laws it holds out induce-
ments to immigration; it passes exemption laws and laws for
the encouragement of trade and agriculture; and under all
these laws a greater or less number of citizens expect to derive

profit and emoluments. But can these laws be regarded as contracts between the State and the officers and corporations who are, or the citizens of the State who expect to be, benefited by their passage, so as to preclude their being repealed? On these points it would seem that there could be no difficulty. When the State employs officers or creates municipal corporations as the mere agencies of government it must have the power to discontinue the agency whenever it comes to be regarded as no longer important. 'The framers of the Constitution did not intend to restrain the State in the regulation of their civil institutions adopted for internal government.' They may, therefore, discontinue offices, or change the salary or other compensation, or abolish or change the organization of municipal corporations at any time, according to the existing legislative view of State policy, unless forbidden by their own Constitution from doing so." Cooley's Const. Lim. (7 Ed.), 387.

We do not think it would be profitable to enter into a discussion of the various phases in which the question has come before this Court. It is a part of the judicial history of the State. It is evident that the effort to carry it to its logical conclusion has rendered it necessary to make many delicate distinctions as to the respect in which and to what extent the word "property" applies to an office, its duties, its emoluments, and when and how an office may be abolished, or the office retained and its duties either transferred to another or distributed among other governmental agencies. We have no disposition to review these cases, but prefer to adopt what may appropriately be called the American doctrine upon the subject, so clearly set forth in a number of the many decisions which we have quoted.

Certainly in one eventful period of the history of the State it did not occur to any one to carry the doctrine of *Hoke v. Henderson* to its logical conclusion. Without entering into

any discussion of the subject, we may, for the purpose of this argument, assume that the State of North Carolina has never at any time from its earliest existence lost or forfeited its Statehood, its political integrity, nor has the allegiance of its citizens or the officers of the State been changed to any other government, except in so far as the State occupied relations to other governments. The tenure of judicial offices in North Carolina prior to 1868 was for life or good behavior. At the end of the civil war a convention was held and certain amendments made to the Constitution, retaining, however, this provision. The Constitution thus amended was ratified by the people and a State government duly organized thereunder. Judges were elected and qualified and were thereby entitled to hold such offices for life. In 1868 a second convention was held, the mode of election changed the tenure from life to a term of eight years, and this Court, then composed of *Pearson, C. J.,* and *Justices Reade* and *Battle,* and the Superior Court bench upon which were several of the ablest lawyers in the State, without question recognized the right of the people by constitutional amendment to deprive them of their offices. It did not occur to either of these judges that they held their offices under any contract, or that they had any property interest therein. So far as the record of our judicial history shows, no question was made of the right of the people by amendment of their Constitution to change the tenure and mode of election of their judges without in any respect abolishing or changing the duties of the office. The Supreme Court and Superior Courts of North Carolina, with few exceptions, were given the same jurisdiction by the Constitution of 1868 which they had under the old Constitution. Whatever status the State may have occupied in its Federal relations from 1861 to 1868, its judges held their offices for life or good behavior, and never by any action on their part forfeited such office to the State, hence when the State resumed its Federal

relations with the United States Government it did so in respect to its original Statehood, and not by virtue of any new source of political life, and if *Hoke v. Henderson* had been the controlling principle they were entitled and it was their duty to continue to hold their office and discharge its duties in accordance with the tenure by which they were originally conferred. Of course, we refer to this portion of our history without reference to the actual conditions existing, and upon the theory that the State in its sovereign capacity having withdrawn its allegiance from in the same capacity resumed it to the Federal Government. *Texas v. White,* 7 Wall., 700; S. C. Rose's Notes, Vol. VI, 1066. It has never been seriously contended that the Judges in North Carolina were not from 1866 to 1868 rightfully in the discharge of their duties, or that the title to their offices were in any respects invalidated. It is a part of the history of this country that in a large majority of the original thirteen States forming the Union the judicial tenure was, as in North Carolina, for life or good behavior. A large number of these States have, since the adoption of the Federal Constitution, amended their constitutions making the judicial tenure for a term of years, and in no instance, so far as our research informs us, was the contention made that the offices were the property of the judges held by grant. The only reference to the question which we find, and that was a mere suggestion, is in *Com. v. Mann,* 5 W. & S. (61 Pa.), 418, and it is disposed of by the Court in the following language: "The point that it is a contract or partakes of the nature of a contract will not bear the test of examination."

While we are not insensible to the responsibility which we assume in overruling a case which has been recognized as a controlling authority upon this subject for more than half a century, we feel that we are discharging a duty which the Court of last resort owes when it has become apparent that

the case brought into question is not supported by sound rea-
son, and is in conflict with the uniform and unbroken cur-
rent of authority in the Federal and State jurisdictions.   In
so far as *Hoke v. Henderson* is based upon a construction of
the Federal Constitution, it is our duty to recognize and en-
force the construction put upon that Constitution by the Su-
preme Court of the United States.   We assume that if by
any lawful procedure the question could come before the Su-
preme Court of the United States, whether an office created
by the Legislature of North Carolina was property within
section 10 of Article I, and the Fourteenth Amendment to
that Constitution, that Court would not hesitate to follow its
decisions rather than those of this State.   But it is said that
we should not disturb a decision so long acquiesced in and
so often followed.   "If a decision is based upon reasoning
that can be shown to be erroneous, that is to say, contrary to
the spirit and analogies of the law, it will be disregarded in
other jurisdictions and may even be overruled in the same
jurisdiction."   Wambaugh's Study of Cases, 53.

   In *Myers v. Craig,* 44 N. C., 169, this Court, referring
to a well-considered opinion theretofore rendered, speaking
through *Pearson, J.,* says: "It is clear *Spruill v. Leary* is
not sustained by *Flynn v. Williams,* and after much research
no authority has been found to support 'the artificial and hard
rule, the practical operation of which at this day would be
to enable one man to sell another man's land without compen-
sation.' "   This was regarded as sufficient reason for over-
ruling a well-settled authority in this State in respect to the
title to land.

   In speaking of the sanctity of judicial precedents, a great
jurist uses the following language: "On the other hand, I hold
it to be the duty of this Court, as well as every other, to revise
its own decisions, and when satisfied that it has fallen into a
mistake to correct the error by overruling its own decisions."

Another Justice says: "It is going quite too far to say that a single decision of any court is absolutely conclusive as a precedent. It is an elementary principle that an erroneous decision is not bad law; it is no law at all. It may be final upon the parties before the Court, but it does not conclude other parties having rights depending upon the same question.

"It is no doubt true that even a single adjudication of this Court, upon a question properly before it, is not to be questioned or disregarded except for the most cogent reasons, and then only in a case where it is plain that the judgment was the result of a mistaken view of the condition of the law applicable to the question. But the doctrine of *stare decisis,* like almost every other legal rule, is not without its exceptions. It does not apply to a case where it can be shown that the law has been misunderstood or misapplied, or where the former determination is contrary to reason. The authorities are abundant to show that in such cases it is the duty of the Courts to re-examine the question. *Chancellor Kent,* commenting upon the rule of *stare decisis,* said that more than a thousand cases could then be pointed out in the English and American Courts which had been overruled, doubted or limited in their application." *Rumsey v. Railroad,* 133 N. Y., 79, 15 L. R. A., 618, 28 Am. St . Rep., 600.

If it is true that a public office is private property, the State, instead of being sovereign, finds herself in her effort to perform her governmental functions bereft of her sovereignty, her hands tied, her progress obstructed, for that those whom she has *commissioned* to be her servants have, by grants of parts and parcels of her sovereignty, become her masters, and, converting her commissions into grants, forbid her to proceed or go forward. That this is not fancy, or an imaginary result of enforcing the principle which we are asked to perpetuate, the reports of decided cases in this Court amply show. When it was sought to change the mode of governing the asy-

lums and other State institutions, as the General Assembly deemed best for the public good, it was claimed and held that the State was powerless because the directors had a grant based upon contract by which they were entitled to manage its institutions for a number of years. *Wood v. Bellamy,* 120 N. C., 212; *Lusk v. Sawyer,* 120 N. C., 122. It was held in *Prison v. Day,* 124 N. C., 369, 46 L. R. A., 295, that, "although a new method of distributing the powers and duties of the government and conduct of the State's Prison may be desirable, and the method undertaken to be adopted by the Act of 1899 may be best, yet such changes cannot be made until the expiration of the contract with the incumbent." The system of Criminal Courts created by legislative enactment could not be changed or the counties in the districts adjusted to suit the needs of the people because the solicitors had contracts with the State and held under grants public offices. *Wilson v. Jordan,* 124 N. C., 683; *McCall v. Webb,* 125 N. C., 243. The right of the State to control, as in the judgment of the representatives of the people it thought best, its property interest in a railroad, was perverted because the directors had by grant property in the office for a term of two years. *Bryan v. Patrick,* 124 N. C., 651. The power to repeal an act, abolish the office of Railroad Commissioner and establish a new commission—an agency of purely legislative creation—was denied for the same reason. *Abbott v. Beddingfield,* 125 N. C., 256. What the representatives of the people deemed an improvement in the public school system was prevented, because with the grant of a public office in his hand a school committeeman asserted his property right to the office. *Green v. Owen,* 125 N. C., 212; *Dalby v. Hancock,* 125 N. C., 325; *Gattis v. Griffin,* 125 N. C., 333.

We do not cite these cases for the purpose of criticising them. For the purpose of the discussion, we regard them as the logical deduction to be drawn from the principle that a

person may have a contractural right to or property in public office.

The facts in this case strikingly illustrate the wisdom of holding that public office is not private property, thus preventing the State and its agencies from performing its functions in respect to its internal government.   It became evident to the Legislature that it would be wise to inaugurate a system of working the public roads of Raleigh Township by the use of the convicts.   For the purpose of doing so a scheme was devised and enacted into law.   Officers were provided for and their mode of election and term of office fixed. In process of time it became necessary to enlarge the operations to other parts of the county.   The plan which had been adopted was found to be wise and it was desired to enlarge its sphere.   It thus became necessary to have other officers, to distribute the duties and subdivide the work.   For this purpose the law of 1903 was enacted.   The whole scheme looked to and had for its object the public good, the improvement of the public roads, not the creation of offices to be granted to the mere agents employed for this purpose.   The relator finds no place in the new scheme for working the roads; he has no duties or powers, and no salary is provided for him. If his contention be correct, the working of the public roads must be stopped until his term of office expires.   This is the logical result of his contention that he has a property right in the office; that he has risen above his source; that instead of being a mere servant or agent, commissioned to discharge certain public duties, he has become the owner of a part of the sovereignty of the State, and at his will a great work of public improvement must stop.   This does violence to our conception of the relation which public servants bear to the people of their government.

The following language used by *Judge Nicholl* in *State v. Dews, supra,* so clearly sets forth the reason upon which

the true principle is founded that we quote at some length: "The appointment of him, as well as other officers, is not a grant in derogation of the rights of the public, but the constituting by the people, in the exercise of their sovereignty, of an agent to carry their sovereignty into effect. In creating an office the body public does not restrict its sovereignty or the power of the Legislature through whom that sovereignty is expressed and exercised. The purpose is to extend the sphere of its action, or at least to give it operation. But if it be true that the officer has a property in his office, that that property embraces its duties as they were prescribed by law at the moment he was commissioned and qualified, and that those duties cannot be changed without a forbidden disturbance of private property, the consequence is that by his appointment the officer becomes placed above the sovereignty of the people during the term for which he is elected."

While it is our duty to search for and, if haply we find the law, to apply it to the case, we think it not improper, in view of the range which the discussion of the principle involved in this case has taken in our Reports, to say, in response to the argument that if the Legislature be permitted to change, modify, abolish or otherwise deal with public office and its incumbents, uncertainty in security and constant disturbance in the administration of the domestic affairs of the State will follow; that ours is a government "of the people, by the people and for the people"; that, except in so far as they have in their organic law limited their power to speak and act through their representatives, sovereignty rests with them. We, who are commissioned to perform judicial functions, may not claim to be wiser than they, or find any other guide for our conduct than the Constitution which they have ordained. If the people have not authorized the legislative department to parcel out their sovereignty by grants of public offices as private property we dare not do so. The Legislature having

134——11

been entrusted with the power of either electing or providing for the election of officers of legislative creation, must, as the representatives of the people, be entrusted to make such changes in the tenure, duties and emoluments of such offices as in its judgment the public interest demands. This power having been vested in that department of the government, it is our duty to obey and enforce the law as the "State's collected will."

To conclude the matter, the doctrine of *Hoke v. Henderson* is based upon the proposition that public office is private property, with all the results that logically flow therefrom. In so far as that case holds this proposition to be law, we expressly overrule it and declare that no officer can have a property in the sovereignty of the State; that in respect to offices created and provided for by the Constitution, the people in convention assembled alone can alter, change their tenure, duties or emoluments, or abolish them; that in respect to legislative offices, it is entirely within the power of the Legislature to deal with them as public policy may suggest and public interest may demand.

The judgment of the Court below is

Affirmed.

CLARK, C. J., concurring. The Court that decided *Hoke v. Henderson* did not deem themselves infallible, for they overruled divers of their own opinions as erroneous, and succeeding Courts have overruled other opinions of that Court. There is no peculiar sacredness attached to *Hoke v. Henderson*. No other court whatever, anywhere or at any time, has followed it as authority. All have concurred in disregarding it and not a few have sharply criticised it, a few of which criticisms have been collected, 127 N. C., at pp. 252, 253. If Mr. Reverdy Johnson paid the decision the scant compliment of mentioning it in his argument in *Ex parte Garland*,

4 Wallace, 333, the opinion of the Court did not treat it with as much consideration. It is not even referred to therein.

Nor has the case always been followed even by this Court. It owes its prominence not to the original decision in 1833, which was not followed for near forty years, but to its revival and wider application after the political changes in 1870 and 1898. Its fundamental doctrine that office is not an agency but property obtained by contract and therefore protected by the contract clause of the Federal Constitution, was most effectually denied by every judge when he took his seat on the Supreme or the Superior Court bench in 1868, since he did so in disregard of that holding. The Convention of 1868 could no more abrogate a contract (if office was a contract) than it could any other contract made in 1865-'68. The Court has often ignored it, notably in *Mills v. Williams,* 33 N. C., 558; *Bunting v. Gales,* 77 N. C., 283, and *Winslow v. Morton,* 118 N. C., 486, and there are other cases in which it has been only partially upheld. Having discussed these cases in numerous dissenting opinions from *Prison v. Day,* 124 N. C., 362, down to *Taylor v. Vann,* 127 N. C., at pp. 240-253, in which last many of the opinions sustaining the legislative power over offices created by legislation are collected, it is not necessary that I should cite them again.

As the essence of the decision in *Hoke v. Henderson* is that office is property based on contract and hence protected by the United States Constitution (for there is no such clause in the State Constitution), the General Assembly could not, if that view was correct, make any rule nor pass any law to disregard it. If they could, then all future contracts of any kind whatsoever could be taken out of the protection of the Federal Constitution by a simple statute that all future contracts shall not have that protection. So far from the Legislature acquiescing, every case, from *Hoke v. Henderson* itself down to *Mial v.*

*Ellington,* the present case, was necessarily presented by legislative action taken in disregard of *Hoke v. Henderson.* As long as the Court held to the doctrine of that case, the Legislature could make no rule to the contrary, beyond persistently disregarding it as it has often done, as evidenced by numerous decisions. There is no way to get rid of the decision except by the Court which made it repudiating it, for the reasons given in the very able opinion filed in this case by *Mr. Justice Connor.*

The Legislature shapes the administrative and political policy of the State, and its members are elected at short intervals for the purpose of conforming the direction of public affairs to the changing sentiment of the people and the progress of events. This policy must be put into operation through officers who are simply agents of the government. If a Legislature elected for two years can put in its agents for life or long terms, and keep them in by the Court's holding that office is a contract and incumbents are irremovable, such temporary Legislature can dominate the people for any period it may see fit to fix for the duration of offices filled or created by it. This is a denial of the foundation principle of all American government—the sovereignty of the people. The fact that the Constitution fixes the term of certain officers and forbids a diminution of their salaries is of itself conclusive that all other officers and their salaries are not thus protected, but are subject to change and control by the people acting through subsequent Legislatures.

It must be remembered that when *Hoke v. Henderson* was decided the United States Supreme Court had not then held, as it soon afterwards did in *Butler v. Pennsylvania,* 10 Howard, 402, 416, that an office was not a contract and not protected by the contract clause of the Federal Constitution. This doctrine that Court has uniformly maintained ever since, notably in *Newton v. Commissioners,* 100 U. S., 548; *Blake*

v. U. S., 103 U. S., 227; Crenshaw v. U. S., 134 U. S., 99, and many other cases, including the late decision in Taylor v. Beckham, 178 U. S., 577. Had those decisions or any one of them been rendered in 1833, it is quite certain Hoke v. Henderson would have been decided the other way, for the construction placed by the United States Supreme Court upon any clause of the Federal Constitution is conclusive upon all other courts.

For well-nigh forty years Hoke v. Henderson was applied to no controversy over an office. In Mills v. Williams, 33 N. C., 358 (1851), it was not cited but disregarded and practically overruled, both in the reasoning of the opinion and its effect, which was to hold that all the duties and emoluments of the office of Sheriff of Polk County were transferred intact to the Sheriff of Rutherford County. In Cotten v. Ellis, 52 N. C., 548, it is true Hoke v. Henderson was cited, but the decision rested on a different point—that the State could not vacate a Federal office. The Legislature of 1865 disregarded Hoke v. Henderson by vacating legislative offices and even filling such judgeships as it saw fit with new men. In 1868 the convention again did the same thing by the judges which Hoke v. Henderson held could not be done as to clerks, i. e., changed the appointive life tenure into an elective term of years. This could not have been done if office were a contract, for the Federal Constitution forbids any "State to pass any law to impair the obligation of a contract." The restriction was upon the State, not merely upon its Legislature. The prohibition applies to a Convention as well as to the Legislature. Louisiana v. Taylor, 105 U. S., 445, and other cases cited, 125 N. C., at p. 285. As already stated, every judge who took his seat upon the bench in 1868 took it in defiance to Hoke v. Henderson. The officers turned out in 1868 held, not by virtue of any authority recognized

in 1861-'65, but they had all been inducted in 1865, after the war closed, or later.

After being thus silent and practically disregarded, without a single application of it for near forty years, *Hoke v. Henderson* was resurrected after the change in the political majority in the General Assembly in consequence of the elections of 1870 and 1872. Its invocation and somewhat more extended application thwarted the effort of the people, through their new representatives, to control the policy of the State, in changing the incumbents of offices created by former Legislatures with men of views in accord with the change expressed at the ballot-box. Later on, however, *Hoke v. Henderson* was practically ignored, or much limited, in *Bunting v. Gales,* 77 N. C., 283; *Winslow v. Morton,* 118 N. C., 486, and other cases.

In *Wood v. Bellamy* there was an application of *Hoke v. Henderson* in a case where new incumbents were placed in offices as to which there had been no change of duties but a change of names only. This decision was within the limits of the original decision. It was the subsequent cases, beginning with *Prison v. Day,* 124 N. C., 362, which carried it further, causing it to be denied and its ultimate and inevitable overthrow. In *Ward v. Elizabeth City,* 120 N. C., 1, attention was for the first time called by the writer to the fact that the decision in *Hoke v. Henderson* had been denied in all other States, and while admitting that it had been recognized in this State, it was held that Ward was not protected by it. In *Caldwell v. Wilson,* 121 N. C., 425, in a very able opinion by *Douglas, J.,* it was again shown (at pages 467 and 468) that *Hoke v. Henderson* was contrary to all precedents elsewhere, and the opinion was expressed that the doctrine had been "carried to its fullest legitimate extent" here, and Wilson, like Ward, was held not protected by it in his office.

With the subsequent expansion of the doctrine to new territory and wider fields, it can serve no purpose now to deal. Those matters have been fully discussed in the opinions and dissenting and concurring opinions filed in the various "office-holding cases," from Day's case, *supra,* in which the Legislature was denied power to control the Penitentiary, down through various offices to *Taylor v. Vann,* 127 N. C., 249, which was as to the costs in an action to recover a $2 per annum office (member of County Board of Education) when the term of the officer had expired before judgment.

Thus expanded, the doctrine necessarily destroyed itself. The people of the State could not and would not be prohibited and controlled in the management of their own institutions and their public policies by judge-made law, which was denied by all other courts, including the highest at Washington. The doctrine has existed nowhere else. The conflict between the Court and the General Assembly could not continue. No act of the Legislature could terminate it. Every time the question has been presented in all these years it has been raised upon an act of the Legislature which had been passed in disregard of *Hoke v. Henderson.* Its assertion could be renounced only by the Court. This it has now done, explicitly, clearly, and the doctrine of private property in public office, started on its course by the decision in *Hoke v. Henderson,* will, like the ghost in Hamlet, "no longer walk the earth" to disquiet the peace.

MONTGOMERY, J., dissenting. *Mr. Justice Connor,* in writing for the Court its opinion in this case, states clearly and forcibly what is called the American doctrine in reference to the nature and tenure of public office, and makes copious extracts from the decisions of the courts of many of the States of the Union, and from two of the Supreme Courts of the United States, in affirmation of the view of the majority of

the Court; and it may be taken as true that the Supreme Court of North Carolina is the only Court, State or Federal, which has held that a legislative office is property; that it is held by contract between the State and the officer, and that the officer can be deprived of his office by judicial determination only. I was aware of this particular isolation of the North Carolina Court when I wrote for the Court, at its February Term, 1897, the opinion in the case of *Wood v. Bellamy*. Why, then, did I not at that time take the opposite view and use my voice to ally the decisions of this Court on the subject under discussion with the universal judicial sentiment of the country?

There were two reasons why I could not do so. The first was, that for almost three score and ten years the law as it was written in *Wood v. Bellamy, supra,* had been the law under decisions of this Court, and those decisions made by judges holding personally different political views, and many of them known to be of marked judicial temperament and ranking in the very highest order of legal learning and general scholarship; and, second, those decisions, and especially the one of *Hoke v. Henderson,* 15 N. C., 1, delivered in 1833 and written by *Chief Justice Ruffin,* seemed to me to be conclusive on the subject. The Judges at that time were *Ruffin* (*Chief Justice*), *Daniel* and *Gaston,* a Court of which any nation in any age might be proud. The opinion is a model of judicial style, notable for its strong and pure English and for the vigor and force of its reasoning. No synopsis of it can do the author justice. Among the conclusions was this: That an office was property, a vested right, existing under contract between the State and the officer, and that an act of the Legislature which sought to deprive the officer of his property in the office was unconstitutional and void. And that proposition was not doubted by this Court until sixty-six years had elapsed, when the dissenting opinion in *Prison*

*v. Day*, 124 N. C., 362, was filed by *Justice Clark,* the present Chief Justice.

Within less than two years before the dissenting opinion in Day's case was filed, the same Justice had written the unanimous opinion of this Court in the case of *Ward v. Elizabeth City,* upholding the doctrine of *Hoke v. Henderson* in the following language: "The only restriction upon the legislative power is that after the officer has accepted office upon the terms specified in the act creating the office, this being a contract between him and the State, the Legislature cannot turn him out by an act purporting to abolish the office but which in effect continues the same office in existence. This is on the ground that an office is a contract between the officer and the State, as was held in *Hoke v. Henderson,* 15 N. C., 1, and has ever since been followed in North Carolina down to and including *Wood v. Bellamy, supra,* though this is the only one of the forty-five States of the Union which sustains that doctrine."

In writing that celebrated opinion (*Hoke v. Henderson*) nearly forty years afterwards, *Pearson, C. J.,* in *Clark v. Stanley,* 66 N. C., 67, 8 Am. Rep., 488, referred to it as "that mine from which so much rich ore has been dug." I cannot think it out of place to quote from the address of the late Honorable William A. Graham on the life of *Chief Justice Ruffin,* his remarks in reference to that great case, *Hoke v. Henderson.* The speaker said: "Judge Ruffin's conversancy with political ethics, public law and English and American history seems to have assigned to him the task of delivering the opinions on constitutional questions which have attracted most general attention. That delivered by him in the case of *Hoke v. Henderson,* in which it was held that the Legislature could not, by a sentence of its own in the form of an enactment, divest a citizen of property, even in a public office, because the proceeding was an exercise of judicial power, re-

ceived the encomium of Kent and other authorities on constitutional law, and I happened, personally, to witness that it was the main authority relied on by Mr. Reverdy Johnson in the argument for the second time in *Ex parte Garland,* which involved the power of Congress, by a test oath, to exclude lawyers from practice in the Supreme Court of the United States for having participated in civil war against the Government, and in which its reasoning on the negative side of the question was sustained by that august tribunal."

The same question was before this Court again in the case of *Cotten v. Ellis,* 52 N. C., 545. The Court there said, through *Pearson, C. J.:* "The legal effect of the appointment was to give the office to the applicant, and he became entitled to it as a 'vested right' for the term of three years, from which he could only be removed in the manner prescribed by law, and of which the Legislature had no power to deprive him. This is settled. *Hoke v. Henderson,* 15 N. C., 1."

And again the question was presented for decision in the case of *King v. Hunter,* 65 N. C., 603, 6 Am. Rep., 754. The opinion in the case was delivered by *Judge Reade,* who said: "Nothing is better settled than that an office is property. The incumbent has the same right to it that he has to any other property. There is a contract between him and the State that he will discharge the duties of the office, and he is pledged by his bond and his oath; and that he shall have the emoluments, and the State is pledged by its honor. When the contract is struck it is as complete and binding as a contract with individuals, and it cannot be abrogated or impaired except by the consent of both parties."

Again the question was presented in the case of *Bailey v. Caldwell,* 68 N. C., 472, and decided in the same way. Upon the reasoning and the authority of the foregoing cases, the numerous decisions involving the same question and heard

in this Court, beginning with *Wood v. Bellamy,* down to this time have been made.

It may not be inappropriate to say that the thorough and elaborate arguments of counsel and the dissenting opinions in the cases that followed *Wood v. Bellamy* very much weakened my view of the correctness of the decision in *Hoke v. Henderson* as applicable to the genius of our institutions and the thought of the age, and I am free to say that if it had been a new question I would have *adopted* what is called by the Court "the American doctrine." But I cannot get my consent to join in overruling the decisions of this Court, beginning with *Hoke v. Henderson* and at intervals down almost to the present day; first, because the law as settled in those decisions has been too long the law of this State to be overthrown by the judicial decree of judges who may not see the law more clearly than did that great Court which made the decision in that celebrated case of *Hoke v. Henderson,* not to mention succeeding judges who followed the precedent.

And again, the General Assembly has met in session more than thirty times since the decision of *Hoke v. Henderson.* Its members knew, at any and all of its sessions, that so far as legislative offices, that is, offices not ordained by the Constitution with fixed terms, were concerned, they could alter the effect of the rule laid down in that case by the enactment of a statute, not *"retrospective"* in its action, thereby interfering with vested rights, but prescribing a rule of property in said office and modifying the extent of interest and tenure therein *"prospectively."* *Caldwell v. Wilson,* 121 N. C., at p. 469. By that means such officers elected or appointed after the going into effect of the act would hold under the statute and subject to its provisions. No such statute has been enacted.

The legislative department has acquiesced in *Hoke v. Henderson* with full knowledge that it had the power to change

the effect of the doctrine announced in *Hoke v. Henderson* in the manner and to the extent above specified. A bill for that purpose was introduced at the session of 1901 and received the unanimous report of the committee which had it in charge, but for reasons satisfactory to them it was not enacted into law.

Under such an act the officer would take his office with the knowledge and understanding when he accepted it that he held it subject to removal under the terms of the act, and no such question could arise as was decided in *Hoke v. Henderson,* where the right to the office was unqualified. In case of removal of any such officer no constitutional provision, either Federal or State, could be invoked to protect his rights of property in case of his removal from office, as he agreed that might be done when he accepted it. It was the Constitution of North Carolina of 1776, adopted at Halifax, which was referred to in the case of *Hoke v. Henderson* as the instrument which was violated by the act of Assembly, and the provision was section 12 in the Declaration of Rights, which was in these words: "That no freeman ought to be taken, imprisoned, or disseized of his freehold, liberties or privileges, or outlawed or exiled, or in any manner destroyed or deprived of his life, liberty or property but by the law of the land." That section is now section 17 of Article I of the Constitution of North Carolina.

There was some discussion in the opinion of the Court, and also in the concurring opinion, of the views and conduct of the judges elected under the State Constitution of 1868. There had never been a decision of the United States Supreme Court holding that an office was property resting in contract. Those judges must have known that fact. In *Hoke v. Henderson* such a holding had been made by our own Court, and no doubt the judges elected under the State Constitution of 1868 believed that a convention of the people had

MIAL *v.* ELLINGTON.

the full right to abolish offices or remove officers, and that in the exercise of that power they had changed the terms of the judges' offices and also removed the incumbents. The doctrine of *Hoke v. Henderson* was that the *Legislature* could not deprive one of his office because it was property and rested in contract, but there is not a hint in the case that the people in convention did not have that power.

I am pleased with the spirit and language of *Mr. Justice Connor* manifested throughout the decision of the case, and especially to that part of it in which reference to the decisions of this Court, which are said by some to be an extension of the doctrine of *Hoke v. Henderson,* is made. I quote it: "We do not think it will be profitable to enter into the discussion of the various phases in which the question has come before this Court. It is a part of the judicial history of the State. It is evident that the effort to carry it to its logical conclusion has rendered it necessary to make many delicate distinctions as to the respect in which and to what extent the word property applies to an office, its duties, its emoluments, and when and how an office may be abolished, or the office retained and its duties either transferred to another or distributed among other governmental agencies. We have no disposition to review these cases, but prefer to adopt what may be appropriately called the American doctrine upon the subject, so clearly set forth in a number of the many decisions which we have quoted."

As to the correctness of the decisions referred to in the above quotation, with the premise admitted that the law of *Hoke v. Henderson* was the recognized law at that time in North Carolina, I am content, as indeed I must be, to abide the judgment of the profession with the hope and in the belief that the judgment of future and of calmer times, if an adverse one, may be expressed more charitably than was that of the opponents of the decisions at the time they were made.

DOUGLAS, J., dissenting. When the opinion of the Court was filed in this case I was so seriously ill as to be helpless, and hence I take advantage of the kindly consent of my associates to now file my dissenting opinion. I would gladly drop the matter but for the feeling that such action on my part might be misunderstood. In the light of an unforgotten past, it seems proper that I should briefly state the facts that constitute my justification in consistently following in my judicial career the principle laid down in *Hoke v. Henderson.* Excuse or apology I have none to offer. I understand that the opinion of the Court goes to the extent of deciding that no one can have any property in the tenure of an office, and "that in respect to legislative offices it is entirely within the power of the Legislature to deal with them as public policy may suggest and public interest may demand." This cuts up by the roots the dominating principle of *Hoke v. Henderson* and of all subsequent cases based thereon. No distinction whatever is made between the different cases involving the application of the principle. It is the principle itself that is denounced as intrinsically vicious, and therefore calling for judicial extirpation. It necessarily follows that in the light of this decision we were just as wrong in 1897 in rendering our unanimous decision in *Wood v. Bellamy, Lusk v. Sawyer* and *Person v. Southerland* (120 N. C., 212, *et seq.*), as we were in any of those subsequent decisions which became the subject of so much controversy.

There has been no change in the law; and if the Court is right now, it was wrong then in refusing to the dominant power in the Legislature the disposition of the offices to which they were legally entitled. It irresistibly follows that if the Court in 1897 had been constituted as it is now, in the light of its present decision, it would have offered no bar to the will of the Legislature, and would have turned over the asy-

lums and other State institutions to those whom we excluded. This seems the very irony of fate.

I will not undertake to defend the principle underlying the decision in *Hoke v. Henderson*, as I can add nothing to what has already been said. My personal views have been fully expressed when speaking for the Court in *Green v. Owen*, 125 N. C., 212, and *Taylor v. Vann*, 127 N. C., 243, and in my concurring opinion in *Wilson v. Jordan*, 124 N. C., 707. I will now confine myself to the reasons actuating me in accepting the principle as settled law when I came upon the bench, and consistently following it thereafter. The Court quotes with approval from my opinion speaking for the Court in *Caldwell v. Wilson*, 121 N. C., 467, as follows: "With the exception of this State, it is the well-settled doctrine in the United States that an office is not regarded as held under a grant or contract, within the general constitutional provision protecting contracts; but unless the Constitution otherwise expressly provides, the Legislature has power to increase or vary the duties or diminish the salary or other compensation appurtenant to the office, or abolish any of its rights or privileges before the end of the term, or to alter or abridge the term, or to abolish the office itself. * * * Except in North Carolina, it is well settled that there is no contract, either express or implied, between a public officer and the government whose agent he is; nor can a public office be regarded as the property of the incumbent." That is true, but the same opinion went on to say: "But our decision in the case at bar does not conflict with that in *Hoke v. Henderson*. The statute now under consideration is not retrospective and does not interfere with any vested right. Being a part of the act originally creating the office of Railroad Commissioner, it 'prescribed' a rule of property in said office, and modifies the extent of interest and tenure therein 'prospectively.' The defendant, taking under the act, holds

subject to the act, and, relying upon his contract, is bound by all its provisions. One of its express provisions was the reserved right of the Legislature to remove and the power and duty of the Governor to suspend under a given state of facts. This power of suspension, together with the necessary method of its enforcement, was assented to by the defendant in his acceptance of the office; * * * that the only property he could have in the office was that given to him by the statute, which must be construed in all its parts. His commission, which is his title deed, appears to us with the fateful words of the created act written across its face by the hand of the law."

In that case I also said for a unanimous Court: "We realize the responsibilities of this Court in settling the line of demarkation between the legislative, executive and supreme judicial powers, which by constitutional obligation must be kept forever separate and distinct. This vital line must be drawn by us alone, and we will endeavor to draw it with a firm and even hand, free alike from the palsied touch of interest or subserviency and the itching grasp of power. Should the legislative or executive departments of the State cross that line, we will put them back where they belong; but upon us rests the equal obligation of keeping upon our own side. This is a question not of discretion but of law, a matter not of expediency but of right."

From the course of judicial conduct thus explicitly declared I have never knowingly departed. At the same term it was said by a unanimous Court in *Ward v. Elizabeth City*, 121 N. C., 1, that "This is on the ground that an office is a contract between the officer and the State, as was held in *Hoke v. Henderson*, 15 N. C., 1, *and has ever since been followed in North Carolina down to and including Wood v. Bellamy*, *supra*, though this State is the only one of the forty-five States of the Union which sustains that doctrine." (The italics

are mine). This language is quoted to show that, whatever differences of opinion may subsequently have arisen as to its *application*, the existence of the principle itself as the settled law of North Carolina was universally admitted. It was so recognized by the Supreme Court of the United States in *In re Hennen*, 13 Pet., 230, where the Court says, on page 261: "The case of *Hoke v. Henderson*, 15 N. C., 1, decided in the Supreme Court of North Carolina, is not at all in conflict with the doctrine contained in the cases referred to. That case, like the others, turned upon the Constitution and laws of North Carolina."

The only argument in the opinion of the Court that had not been previously advanced and considered is the change in the personnel of the Supreme and Superior Courts following the adoption of the Constitution of 1868 and the relation of the seceding States to the Federal Union.

I will not reopen the questions involved in the civil war and the tangled web of reconstruction. The issues of the war were settled by embattled freemen who, on both sides, believing that their cause was sacred, freely gave to it the last tribute of a loyal heart. All that we need do is to cherish the memory of their heroic deeds and guard their last resting place, feeling that every flower growing on a soldier's grave nestles its roots in a hero's breast and expands its fairest flowers in the glad sunshine of liberty and peace in a reunited land.

When I first came upon this bench, its only new member, and in every way its junior, I was at once confronted with the class of cases represented by *Wood v. Bellamy*. After the most careful consideration, and certainly with no possible personal bias in that direction, I concurred with a unanimous Court in the decision of those cases, thus giving to the greatest principle enunciated in *Hoke v. Henderson* the deliberate assent of my judgment and my conscience. Even if I had

134——12

not approved of the decision in principle, I would have hesitated to place myself upon the lonely pedestal of solitary infallibility, assuming that I was wiser than the aggregated wisdom of the Court for more than sixty years.

I do not look upon the system of jurisprudence as a mere heterogeneous conglomeration of disjointed opinions, but as a harmonious whole, in which every case fits accurately upon those that have preceded it, and in turn becomes the foundation for others. Thus is reared the noble structure with all the beauty, simplicity and grandeur of a Grecian temple. So feeling, I did not seek to signalize my advent upon the bench by prizing out the foundation stones of the law, but rather by building up, satisfied if I could add to the structure but one stone, small and rough-hewn though it be.

The opinion in *Hoke v. Henderson* was delivered at the December Term, 1833, of this Court by *Chief Justice Ruffin* and concurred in by his associates, *Judges Daniel* and *Gaston*. This great Court sat together unchanged for more than ten years and has no superior here or elsewhere, either in the ability and integrity of judicial conduct or the purity of private life. No finer combination of judicial and individual character has ever existed upon any bench. *Chief Justice Ruffin* stands at the head of the profession in this State, with no possible rival, unless it be *Chief Justice Pearson,* who paid him the high compliment of saying that while *Chief Justice Taylor* was the most learned man that had ever been upon this bench, and *Chief Justice Henderson* its most reflective mind, Ruffin combined both qualities in a higher degree than any one else. *Judge Daniel's* opinions are models of brevity, strength and clearness. *Judge Gaston* was the *beau ideal* of North Carolinians, whose character contained the flower and fragrance of every virtue. I have often thought that the splendor of his intellectual qualities was overshadowed by the sublimity of his moral character. It may well be said of

him that among the great men of his generation, few have left a more splendid and none a more stainless name.   It is the deliberate judgment of his countrymen that throughout a long and distinguished life he ever bore the trenchant blade of heroic manhood with the spotless shield of Christian chivalry.

But it has been intimated that that opinion was not carefully .considered, and that those eminent judges, like Homer, might sometimes nod.   The opinion itself shows no evidence of haste or want of deliberation.   On the contrary, it is regarded as a model by the best of judges, and has repeatedly received the warmest commendation from the highest sources.

I know it is said that even Homer sometimes nods; but I never heard of his going to sleep and continuing in a profound slumber for seventy years.   It remained for the Courts of North Carolina to take this more than Rip Van Winkle nap, and as we wake up we may well ask where are Ruffin and Daniel and Gaston and Pearson?   Gone!   And we who sit in the ever-widening shadow of their fame are asked to say that they knew not whereof they spoke!   Let this be said by those who may—it shall not come from me.

Having given to the principles of that opinion the deliberate assent of my judgment and my conscience in *Wood v. Bellamy* and the kindred cases decided at that term, I deemed it my duty to carry them to their legitimate conclusion.   If it was the law when *Wood v. Bellamy* was decided, in 1897, it remained the law in the absence of constitutional or statutory provisions; and those who subsequently invoked those identical principles were entitled to their equal protection. If they were sacred enough in 1897 to keep Bellamy in office, they retained equal sanctity in 1899, when invoked in favor of Day.   It may be that the application of those principles was carried too far in some subsequent cases, but I did the best I knew.   I admit that sometimes my opinions when once formed may be too firmly fixed.   Be'that as it may, they are

the result of reflection and conviction, and take their texture more from the granite of my native hills than the shifting sand dunes of a storm-swept coast. In these cases I but followed the injunction of this Court in *Sutton v. Phillips,* 116 N. C., 502, wherein it says, on page 508, that "It is best to stand *super antiques vias.*" I am painfully aware of the frequent appearance of the personal pronoun in this opinion, and deeply regret its apparent necessity.

An examination of the constitutional history of the State, I think, will clearly show that the principles so clearly enunciated in *Hoke v. Henderson* have not only received the practically unanimous approval of succeeding judges, but have by direct implication been repeatedly ratified by the people themselves. This decision was rendered at the December Term, 1833, reported in 15 N. C., 1. Since that time there have been five separate and distinct constitutional conventions, all of which might, but none of which have, abrogated or modified the principles of that opinion.

In 1835 a constitutional convention met on June 4 and framed amendments to the Constitution of 1776, which were ratified by the people. In 1861 a convention met and on May 20 passed the Ordinance of Secession, with some other amendments, none of which were submitted to the people. In 1865 a convention met on October 9, repealed the Ordinance of Secession and passed an ordinance prohibiting slavery. This convention reassembled in May, 1866, and further amended the Constitution; but with the exception of the above ordinances relating to secession and slavery, the amendments were rejected upon submission to the people.

A convention called by General Canby under the Reconstruction Act of Congress, assembled on January 14, 1868, and framed the "Constitution of 1868," which was ratified by the people. In 1875 a convention assembled on September 6 and amended the Constitution in several particulars, their

action being ratified by the people at the election in 1876. In addition to these conventions, several amendments have been made by legislative action and popular ratification, such as the celebrated "free suffrage" amendment of 1854, and those prohibiting the payment of the special tax bonds, relating to the election of trustees of the University, increasing the number of Justices of the Supreme Court, and some relating to other particulars set out principally in chapters 81, 82, 83, 84, 85, 86, 87 and 88 of the Laws of 1872-'73. To these may be added the recent amendment restricting the suffrage. The various amendments made many changes of far-reaching importance, including the successive repudiation of the governments of the United States and of the Confederate States and the enfranchisement and practical disfranchisement of the negro, but the underlying principle of *Hoke v. Henderson* remained unchanged.

Moreover, in the seventy years that have elapsed, thirty-five different Legislatures have met in the aggregate more than forty times, and yet no bill to do away with the effect of these decisions has ever got beyond the calendar. Under the decisions of this Court, have I not a right to assume that this long and unbroken legislative acquiescence in this decision is an endorsement of its essential principles? The Supreme Court of the United States, in *Railroad v. Baugh,* 149 U. S., 368, says on p. 372: "Notwithstanding the interpretation placed by this decision on the thirty-fourth section of the Judiciary Act of 1789, Congress has never amended that section; so it must be taken as clear that the construction thus placed is the true construction, and acceptable to the legislative as well as to the judicial branch of the government."

In *State v. Cole,* 132 N. C., 1069, in an able and learned opinion, this Court says, on page 1079: "To the suggestion that the construction put upon the statute in *State v. Fuller,* 114 N. C., 885, decided in 1894, is "unfortunate," we note

that the *personnel* of this Court has since that time undergone many changes, and the case has at almost every term been cited with approval and conceded to be the controlling authority for this Court. It is also worthy of note that the Legislature has met at five different sessions and the law in this respect has not been changed. We have no other means of ascertaining what the law is."

In *Harvey v. Johnson,* 133 N. C., 352, another well-considered opinion, this Court says, on page 360: "We have seen that no change has been made by legislation in the law as repeatedly stated by this Court, and it may safely be inferred that the Legislature has accepted our construction of the statute as the proper one, and has acquiesced in it as being in accordance with what the law should be."

In addition to this long and uniform legislative acquiescence, we have its express approval by legislative as well as constitutional action. The convention of 1875, in amending the Constitution, provided in what is now section 33 of Article IV of the Constitution that "the amendments made to the Constitution of North Carolina by this convention shall not have the effect to vacate any office or term of office now existing under the Constitution of the State and filled or held by virtue of any election or appointment under the said Constitution and the laws of the State made in pursuance thereof."

Section 3872 of The Code also provides that "All persons who shall hold any office under any of the acts hereby repealed shall continue to hold the same according to the tenure thereof." Moreover, a bill entitled: "A bill to be entitled an act to restore to the General Assembly the power to prescribe and regulate the tenure of public offices and the duties and emoluments thereof" was introduced into the Legislature of 1901. This bill provided that every office, place or position created by the General Assembly should be held and

deemed a mere agency or trust, and not a contract, and that no person thereafter appointed should be deemed to have any property right or vested interest in any such office, but that any such office, place or position might be abolished, changed, vacated or transferred at the pleasure of the General Assembly. This bill was carefully and elaborately drawn by a most skillful draftsman, and was well calculated to effect its purpose. It was valid under the decision of this Court in *Caldwell v. Wilson,* and if then passed would by this time have practically controlled nearly every legislative office in the State. Its sole purpose, openly avowed and fully understood, was to abolish the office-holding rule enunciated in *Hoke v. Henderson.* What was its fate? It was introduced into the House on February 18, 1901, and was at once referred to the Judiciary Committee. On the following day it was reported back favorably by that committee, and later, on the same day, was recommitted to the same committee. On March 15, it was indefinitely postponed, without division and apparently by a unanimous vote. Conceding to the Legislature that devotion to duty and integrity of purpose which they are entitled to claim, we must assume that if they had thought the purposes of the bill were in furtherance of the public interests they would have passed it unanimously. As it is, we are equally forced to assume that their unanimous defeat of the bill was a unanimous approval of the principles of judicial decision which the bill was intended to abrogate.

In view of this long and unbroken acquiescence of the people in constitutional conventions, as well as in the General Assembly, I see neither reason nor authority for overruling the uniform decisions of seventy years. Whether this decision, now rendered by a mere majority of the Court, will be permanently accepted as the law of the land, remains to be seen. It may be that in the dawn of another day this Court may return to "the teachings of the elders."

In the meantime, I must rest in my ignorance, if such it be, in union with the deathless dead, content to be no wiser than Ruffin, nor purer than Gaston.